**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JANET GODINEZ, et al. | ) | |
| | ) | |
| | ) | Case No. 16 C 7344 |
| Plaintiffs, | ) | |
| | ) | Judge Pallmeyer |
| v. | ) | |
| | ) | |
| CITY OF CHICAGO, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT CITY OF CHICAGO'S MOTION TO BAR**
**PLAINTIFF'S RETAINED EXPERT DR. JAN LEESTMA OR IN THE ALTERNATIVE**
**FOR EVIDENTIARY HEARING AS TO THE ADMISSIBILITY OF HIS TESTIMONY**

Avi Kamionski
Shneur Nathan
Robin Shoffner
Christopher Wallace
Natalie Adeeyo
Nathan & Kamionski LLP
33 West Monroe, Suite 1830
Chicago, IL 60603
(312) 612-1928

*Attorneys for Defendant City of Chicago*

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

THE DAUBERT FRAMEWORK ........................................................................................2

ARGUMENT ........................................................................................................................3

I. DR. LEESTMA'S OPINION #1 REGARDING GLOBAL HYPOXIC-ISCHEMIC BRAIN INJURY IS A NON-SPECIFIC FINDING AND DOES NOT LEND CREDIBILITY TO HIS SUBSEQUENT OPINIONS. ................................................................................................................. 5

II. DR LEESTMA'S FOUNDATIONAL ASSUMPTION IN OPINION #2 THAT GODINEZ'S NECK BECAME HYPERMOBILE DUE TO OFFICER CONDUCT CAPTURED ON VIDEO HAS NO SCIENTIFIC BASIS AND LEESTMA HIMSELF RETREATED FROM THIS OPINION AT HIS DEPOSITION. ............................................................................................................... 5

    A. THERE IS INSUFFICIENT SCIENTIFIC BASIS FOR A DETERMINATION THAT GODINEZ'S NECK WAS ACTUALLY HYPERMOBILE. ........................................................ 6

    B. EVEN IF GODINEZ'S NECK WAS "HYPERMOBILE", DR. LEESTMA CANNOT RELIABLY ATTRIBUTE THE CONDITION TO CONDUCT OF POLICE OFFICERS OR RELIABLY OPINE THAT THIS CONDITION MADE GODINEZ MORE SUSCEPTIBLE TO FURTHER INJURY. ................................................................................................ 7

III. DR. LEESTMA'S OPINION #3 THAT GODINEZ SUFFERED A SPINAL CORD INJURY WITHOUT RADIOLOGICAL ABNORMAILITY ("SCIWORA") LEADING TO PARALYSIS, INABILITY TO BREATH, AND DEATH IS UNSUPPORTED BY SCIENCE OR A LEGITIMATE METHODOLOGY. .............................................................................................. 8

    A. THE SCIENTIFIC BASIS FOR DR. LEESTMA'S OPINION IS NOT RELIABLE BECAUSE THE CERVICAL SPINAL CORD WAS NEVER MADE INTO SLIDES FOR MICROSCOPIC ANALYSIS. ................................................................................................... 10

    B. DR. LEESTMA'S OPINION LACKS ANY PROPER METHODOLOGY FOR CONCLUDING SCIWORA CAUSED GODINEZ'S DEATH. .......................................................... 12

    C. DR. LEESTMA'S OPINION ALSO REQUIRED ONE TO SPECULATE THAT THE PHRENIC NERVE WAS INJURED AND THAT IT CAUSED BILATERAL DIAPHRAGM PARALYSIS. ..... 16

    D. DR. LEESTMA SPECULATES HOW LONG A PERSON WOULD LIVE AFTER DIAPHRAGM PARALYSIS. .............................................................................................. 17

    E. DR. LEESTMA CONCEDES THAT HE CANNOT RULE OUT EXCITED DELIRIUM AS THE CAUSE OF DEATH. ............................................................................................ 18

ii

F.   Dr. Leestma's Methodology Fails To Account For The On Scene Witness Testimony That Godinez Was Moving Very Shortly Before His Death. .... 20

**IV.   Dr. Leestma Is Not Qualified To Opine On Godinez's Cause Of Death. ....... 21**

**CONCLUSION**..................................................................................................................**23**

## TABLE OF AUTHORITIES

**CASES**

*Bickel v. Pfizer, Inc.*, 431 F. Supp. 2d 918, 921 (N.D. Ind. 2006) .................................................. 3

*Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014) ................................. 3

*Cunningham v. Masterwear Corp.*, 569 F.3d 673, 675 (7th Cir. 2009) ......................................... 22

*Daubert v. Merrell Dow Pharmaceuticals* ............................................................................... 1, 3

*Equal Emp't Opportunity Comm'n v. Rockwell Int'l Corp.*, 60 F.Supp.2d 791, 795 (N.D. Ill. 1999) .......... 21

*Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007) .............................................. 3

*Goodwin v. MTD Products, Inc.*, 232 F.3d 600, 609 (7th Cir. 2000) ............................................ 22

*Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 825-26 (7th Cir. 2010) ......................................... 21

*Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 705 (7th Cir. 2015) .................................................. 22

*Kane v. Motorola*, Inc., 335 Ill.App.3d 214, 220, 779 N.E.2d 302, 307, 268 Ill.Dec. 688, 693 (Ill.App. 1 Dist. 2002) ............................................................................................................................ 4

*Kunz v. DeFelice*, 538 F.3d 667, 675-76 (7th Cir. 2008) ............................................................... 3

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, No. 02–4356, 2010 WL 2607241, at *5 (N.D. Ill. June 23, 2010) ................................................................................................................................. 21

*O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1106 (7th Cir. 1994) .............................. 18

*See, e.g., Sommerfield v. City of Chicago*, 254 F.R.D. 317, 321 (N.D. Ill. 2008) ......................... 21

*Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ........................................................ 3

*State v. Pingle*, 158 Wash. App. 1011 (Wash. Ct. App. 2010) ...................................................... 4

*Wilson v. City of Chicago*, 6 F.3d 1233, 1239 (7th Cir. 1993) .................................................... 22

*Yang v. Air China Ltd.*, No. 14 C 6482, 2017 WL 4283953, at *7 (N.D. Ill. Sept. 27, 2017) ...... 8, 15, 16

*Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 640 (7th Cir. 2003) ............................................... 3

**RULES**

Fed. R. Evid. 702 ............................................................................................................................ 1, 3

Defendant City of Chicago, (the "City"), by and through its attorneys, Nathan & Kamionski LLP, hereby moves *in limine*, pursuant to Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, to strike and bar the testimony of Plaintiffs' retained expert Dr. Jan Leestma ("Dr. Leestma") or, in the alternative, for an evidentiary hearing as to the admissibility of his testimony. In support of its motion, the City states as follows:

## INTRODUCTION

At the time of his death on July 20, 2015, Heriberto Godinez had 1,400 nanograms per milliliter ("ng/ml") of cocaine in his peripheral blood. (SOF ¶40). According Dr. Latanja Watkins, the forensic pathologist who performed the autopsy of Godinez for the Cook County Medical Examiner's Office ("CCME"), Godinez's levels of cocaine and alcohol intoxication alone would be a suitable cause of death. (SOF ¶40). Similarly, Dr. J. Scott Denton, an independent forensic pathologist hired by the Cook County State's Attorney's Office, determined "that the cause of death for Mr. Heriberto Godinez is best certified as cocaine intoxication and the manner of death is best certified as accident. There is no physical evidence that the restraint actions of the police caused or contributed to his post-restraint cocaine intoxication-related fatal cardiac arrhythmia while in the stationary transportation van." (SOF ¶57).

The CCME investigation also included consultations with a radiologist and two neuropathologists. The radiologist determined that there was no evidence of fracture to Godinez's spine. (SOF ¶47). Neuropathologist Qinwen Mao of Northwestern's Feinberg School of Medicine created slide samples from Godinez's spine on August 18, 2015 in the presence of Plaintiff's expert, Dr. Jan Leestma. (See SOF ¶59). Dr. Mao reviewed the spine microscopically and determined that it was "unremarkable." (SOF ¶¶66-67). Nearly four years later, on April 26, 2019, Dr. Leestma issued his report setting forth the following three (3) opinions:

1

- **Opinion 1**: Before his death, Mr. Godinez's brain was deprived of blood flow and/or oxygen intermittently or all at once, or both, causing him to suffer an acute diffuse global anoxia and/or hypoxia-ischemic brain injury.

- **Opinion 2:** Mr. Godinez suffered trauma to the neck that made his neck hypermobile and probably unstable which made him vulnerable to a spinal cord injury during transport.

- **Opinion 3:** Mr. Godinez suffered a spinal cord injury in the region of the C2-C4 vertebrae, which ultimately paralyzed him from the neck down and caused him to suffocate.

(*See* Report of Dr. Jan Leestma Dated April 26, 2019 ("Leestma Report"), attached hereto as Exhibit ("Ex.") 1).

Dr. Leestma's ultimate opinion in this case is that the officers who can be seen interacting with Godinez on a police dash camera video ("Video") caused Godinez's neck to become "hypermobile", rendering him more vulnerable to becoming injured by some unknown event that, Dr. Leestma claims, must have caused injury to the C2-C4 region of Godinez's cervical spine while he was in the police transport van, which ultimately led to Godinez's inability to breathe and eventual death. As described more fully below, Dr. Leestma's cause and manner of death opinion depends on multiple assumptions which are unsupported by science or the record and are chained together to arrive at a wildly unreliable opinion. As such, he should be barred from providing expert testimony in this case. Dr. Leestma should be barred for the additional reason that he is not qualified to provide opinions on cause of death.  Alternatively, this Court should hold an evidentiary hearing as to the admissibility of Dr. Leestma's opinion in this matter.

## **THE DAUBERT FRAMEWORK**

The legal standard for the admission or exclusion of expert testimony is well established. In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court explained that a district court has a "gate keeping role" of ensuring an expert's testimony is both reliable and relevant. 509 U.S. 579, 597 (1993). These principles, along with Fed. R. Evid. 702, govern the admissibility of expert testimony.

*Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007). It is the proponent of the expert testimony who shoulders the burden of establishing the offered testimony is reliable. *Bickel v. Pfizer, Inc.*, 431 F. Supp. 2d 918, 921 (N.D. Ind. 2006).

Federal Rule of Evidence 702 permits a "witness who is qualified as an expert by knowledge, skill, experience, training, or education" to give testimony only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles or methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. When Rule 702 and *Daubert* are combined together, the district court must determine whether proposed expert testimony is both relevant and reliable. *Kunz v. DeFelice*, 538 F.3d 667, 675-76 (7th Cir. 2008); *Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 640 (7th Cir. 2003).

"To gauge reliability, the district judge must determine whether the expert is qualified in the relevant field and whether the methodology underlying the expert's conclusions is reliable." *Id.* Finally, "[e]ven a supremely qualified expert cannot waltz into a courtroom and render opinions unless those opinions are based upon some recognized scientific method." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). "Rule 703 requires the expert to rely on 'facts or data,' as opposed to subjective impressions." *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 772 (7th Cir. 2014). Because of the lack of qualifications, the failure to apply reliable methods, and the choice to resort to speculation in the absence of evidence, Dr. Leestma's opinions must be barred.

## ARGUMENT

This is not the first time Dr. Leestma has used his credentials to speculate for the benefit of litigants and failed to tether his opinions to scientific methodology. Several courts have barred his

3

testimony finding that he has exceeded the limits of science and resorted to speculation to reach opinions. *Kane v. Motorola*, Inc., 335 Ill.App.3d 214, 220, 779 N.E.2d 302, 307, 268 Ill.Dec. 688, 693 (Ill.App. 1 Dist. 2002) ("The circuit court granted defendants' motion to strike [Dr. Leestma], noting that [his] testimony was based upon speculation rather than scientific evidence"); *State v. Pingle*, 158 Wash. App. 1011 (Wash. Ct. App. 2010) ("The court ruled that Dr. Leestma's findings related to the heart and lungs were speculative and, therefore, not helpful to the trier of fact."). In *People v. Louise Woodward*, Dr. Leestma's testimony challenging shaken baby syndrome was apparently so incredible that 72 medical professionals, including a former colleague, penned a letter in the journal *Pediatrics* rebuking Dr. Leestma's opinion that minor trauma caused a re-bleed of an earlier head injury as "inaccurate, contrary to vast clinical experience, and unsupported by any published literature." (Deposition ("Dep.") of Jan Leestma M.D. at 194:15-196:13, attached hereto as Exhibit 2); (*see* Transcript in *People v. Mark Unger* 05-1955-FH (2012) at 360:4-365:22, attached hereto as Exhibit 3) ("Let those who would challenge the specificity of these diagnostic features first do so in the peer-reviewed literature, before speculating on other causes in court.").

Here, Dr. Leestma has again strayed from his expertise, abandoned scientific methodology, and resorted to speculation for the benefit of litigants. In summary, Dr. Leestma attempts to issue a cause of death opinion based on an alleged viewing of a histology slide cut from a portion of the cervical spine that did not actually exist. Even if the cervical spine were available for analysis (which it is not), Dr. Leestma's claim that a single histology slide provides him with a basis to diagnose a spinal cord injury that fully impaired the phrenic nerve and caused neck-down paralysis that prevented breathing lacks reliable scientific methodology. Finally, even if these opinions could theoretically be provided by a conglomeration of other experts, Dr. Leestma is not qualified to render these opinions. Therefore, the Court must either bar Dr. Leestma from providing opinions

that are unscientific, inaccurate, and unsupported by any published literature or, in the alternative, hold an evidentiary hearing to ensure the admissibility of his testimony.

## I. DR. LEESTMA'S OPINION #1 REGARDING GLOBAL HYPOXIC-ISCHEMIC BRAIN INJURY IS A NON-SPECIFIC FINDING AND DOES NOT LEND CREDIBILITY TO HIS SUBSEQUENT OPINIONS.

The initial opinion offered by Dr. Leestma regarding evidence that Godinez's brain had global hypoxic-ischemic injury does not actually support any of Dr. Leestma's opinions regarding causation. While the written report intimates that this finding provides some kind of scientific basis for Dr. Leestma's other opinions, it in fact does not.

Dr. Leestma, explained at his deposition that the finding of global hypoxic-ischemic injury is not specific and can be the product of several variables. He acknowledged that some form of hypoxic/ischemic injury is observed in every autopsy and there is no indication that this brain finding was the result of anything the police officers did on the Video. (Ex. 2, 147:5-148:5). Similarly, Dr. Leestma could not rule out that Dr. Watkins' reference to global hypoxic/ischemic injury occurred as a result of Godinez sustaining a heart attack during the process of dying from cocaine. (Ex. 2, 148:13-149:4). Dr. Leestma explained that the identification of a global hypoxic-ischemic injury merely identifies "the mechanism of how that happens, but there's many processes that can cause that," like cocaine intoxication, spinal cord injury or cardiac arrest. (Ex. 2, 213:12-17). The non-specific nature of the global hypoxic/ischemic injury finding is further supported by the testimony of Doctors Watkins, Denton, and Mao, who state that this injury is seen in virtually every death. (SOF ¶¶49, 56, 64). Ultimately, even Dr. Leestma concedes that global hypoxic/ischemic injury just means the cessation of blood and oxygen to the brain. (Ex. 2, 213:18-23).

## II. DR LEESTMA'S FOUNDATIONAL ASSUMPTION IN OPINION #2 THAT GODINEZ'S NECK BECAME HYPERMOBILE DUE TO OFFICER CONDUCT CAPTURED ON VIDEO HAS NO SCIENTIFIC

**BASIS AND LEESTMA HIMSELF RETREATED FROM THIS OPINION AT HIS DEPOSITION.**

In an attempt to link his ultimate causation opinion about some unspecified cervical spinal injury in the police van to officer conduct captured on the Video, Dr. Leestma speculates that Godinez's neck became "hypermobile" and therefore susceptible to injury from some unidentified event that happened on the Video. This hypermobility opinion is thus foundational to Dr. Leestma's causation opinion, and without a reliable opinion about officer-induced neck hypermobility, the rest of Dr. Leestma's opinion also fails. As set forth below, Dr. Leestma comments on hypermobility are without scientific basis because (1) he cannot determine whether Godinez's neck was in fact hypermobile; and (2) even if it was hypermobile, he cannot determine whether (i) this finding was caused by any police officer or (ii) this finding would in fact render Godinez more susceptible to injury.

**A. There Is Insufficient Scientific Basis For A Determination That Godinez's Neck Was Actually Hypermobile.**

Dr. Leestma does not explain what he means by "hypermobile" and admits he does not have any particular specialty in diagnosing hypermobility in a neck. (Ex. 2, 166:5-9). Because Dr. Leestma attributes the hypermobility finding to the pathologist, (Ex. 2, 164:5-9), presumably Dr. Leestma is relying upon a reference to the medical examiner's report where Dr. Watkins reported "there was palpable laxity of the neck on rotation." (CCME Report of Postmortem Examination of Heriberto Godinez Jr. at 2, attached hereto as Exhibit 4). The more fundamental problem, however, is that Dr. Watkins explained that the palpable neck laxity she initially found was merely a preliminary finding that led her to investigate further through dissection of the neck. (Dep. of LaTanja Watkins M.D. at 22:17-24, attached hereto as Exhibit 5). Upon dissection, Dr. Watkins found no injury to the

6

muscles, ligaments, or tendons in his neck. (SOF ¶¶47-48). She further explained that people often have "palpable laxity" in the neck at autopsy because of decomposition. (SOF ¶48).

Similarly, Dr. Denton explained that the mild neck laxity noted in Dr. Watkins's report was not due to trauma. Rather, the neck laxity was attributable to hyperthermia and rigor mortis. (SOF ¶54). This is consistent with the radiological finding that there was no fracture to the neck. (SOF ¶47). Furthermore, it is consistent with the examination and findings by independent neuropathologists Drs. Mao and Bigio, who confirmed that there was no injury or trauma to the spinal cord. (SOF ¶¶66-67). In light of this overwhelming medical evidence that Godinez's neck laxity is of no clinical significance, Dr. Leestma's failure to explain how he concludes that Godinez's neck was hypermobile and why he is "viewing the hypermobility as an abnormal condition", (Ex. 2, 164:17-23), renders his reliance upon this assumption unreliable and, at a minimum, insufficiently explained for purposes of Fed. R. Civ. P. 26(a)(2)(b) and Fed. R. Evid. 702.

**B. Even If Godinez's Neck Was "Hypermobile", Dr. Leestma Cannot Reliably Attribute The Condition To Conduct Of Police Officers Or Reliably Opine That This Condition Made Godinez More Susceptible To Further Injury.**

Even assuming Godinez's neck was in fact "hypermobile", it does not follow that police officers caused this condition or that it would have made Godinez more susceptible to injury. Dr. Leestma admits that a neck hypermobility finding does not necessarily mean it was caused by any of the officers, or that Godinez was actually more susceptible to injury than he was before interacting with the officers. Contrary to his report, Dr. Leestma admitted at his deposition that he does not know how Godinez neck became hypermobile and cannot point to any information in the record to substantiate that something other than Godinez's own actions caused it. (Ex. 2, 63:12-65:9). Dr. Leestma further conceded that he is unable to opine if Godinez's neck became hypermobile before,

during or after his encounter with the police. (Ex. 2, 63:12-65:9). Dr. Leestma admits, "I don't know which movements, if any, were related [] causality." (Ex. 2, 64:7-8).

Importantly, Dr. Leestma further concedes Dr. Watkins' finding of palpable neck could represent nothing out of the ordinary and individuals within the everyday population can have neck hypermobility. (Ex. 2, 165:5-13). In fact, individuals can naturally have hypermobile necks. (Ex. 2, 119:13-18, 165:5-7). Dr. Leestma has no special knowledge about the issue of hypermobility in necks and, critically, he lacks any special qualification to opine on what causes a neck to become hypermobile. (Ex. 2, 166:5-9). Ultimately, Dr. Leestma concedes he is unable to opine if Godinez's neck became hypermobile before, during or after his encounter with the police. (Ex. 2, 63:12-65:9). Dr. Leestma said it best "I don't know which movements, if any, were related [] causality." (Ex. 2, 64:7-8).

In sum, Dr. Leestma unreliably assumes Godinez's neck was hypermobile, assumes the condition was caused by police, and assumes that this condition left Godinez more susceptible to an injury to his cervical spine. At bottom, Dr. Leestma provides no basis for his conclusion that Godinez's neck was "probably unstable" and that he was "vulnerable to a spinal cord injury during transport" other than pure speculation. Thus, Dr. Leestma's foundational opinion that officer conduct caused neck hypermobility due to actions of police officers on the Video should be barred. *See Yang v. Air China Ltd.*, No. 14 C 6482, 2017 WL 4283953, at *7 (N.D. Ill. Sept. 27, 2017)(Pallmeyer, J)(Excluding emergency room doctor's opinion that plaintiff died from a fall and that the fall was caused by the height or condition of an airline door as based on "pure speculation").

### III. DR. LEESTMA'S OPINION #3 THAT GODINEZ SUFFERED A SPINAL CORD INJURY WITHOUT RADIOLOGICAL ABNORMAILITY ("SCIWORA") LEADING TO PARALYSIS, INABILITY TO BREATH,

**AND DEATH IS UNSUPPORTED BY SCIENCE OR A LEGITIMATE METHODOLOGY.**

Building from his impermissibly speculative assumption that Godinez sustained an injury causing his neck to become hypermobile and more susceptible to spinal cord injury, Dr. Leestma goes on to assert: "Mr. Godinez suffered a spinal cord injury in the region of the C2-C4 vertebrae, which ultimately paralyzed him from the neck down and caused him to suffocate." (Ex. 1 at 3). Dr. Leestma's report asserts that the basis for this opinion is his observation of "edema and small hemorrhages in Mr. Godinez's spinal cord near the location of the C2-C4 vertebrae, which indicate the early stages of a spinal cord injury (see slide examples) causing phrenic nerve paralysis and loss of diaphragmatic function." (Ex. 1 at 3). At his deposition, Dr. Leestma identified the slide referred to in the preceding sentence as a single histology slide—slide # 11—which he claimed was taken from a tissue block created when he observed the spine with Dr. Mao. (Ex. 2, 54:7-55:11, 68:3-69:8). Despite the fact that Dr. Leestma acknowledges that the radiology images and autopsy dissection revealed no fractures to the spinal cord, he contends that something within slide #11 led him to conclude that Godinez nevertheless sustained a spinal injury so significant that it paralyzed Godinez from the neck down and rendered him unable to breath. (Ex. 1 at 3).

The causation opinion of Dr. Leestma is unreliable for several reasons, any one of which is a sufficient basis to bar his testimony under *Daubert* and Fed. R. Evid. 702. First, Dr. Leestma's conclusion regarding cervical spinal injury in slide 11 is **factually impossible** since, as set forth below, there is no cervical spinal tissue in slide 11.  This alone leaves Dr. Leestma's opinion without any factual basis and, thus, it is a non-starter. Second, even if Godinez's cervical spine was available to Dr. Leestma for examination, he fails to explain what it is about slide #11 that reliably evidences an extremely rare SCIWORA at the C2-C4 level to the exclusion of other explanations, such as cocaine toxicity.  Third, even if there was a legitimate basis to find a SCIWORA injury, Dr. Leestma

9

does not describe any scientific basis to conclude that Godinez sustained a severe phrenic nerve injury that would cause diaphragmatic paralysis and a complete inability to breathe. In short, Dr. Leestma has no scientific basis to claim that Godinez was paralyzed from the neck down and asphyxiated due to the actions of police officers.

**A.     The Scientific Basis For Dr. Leestma's Opinion Is Not Reliable Because The Cervical Spinal Cord Was Never Made Into Slides For Microscopic Analysis.**

A plain reading of Dr. Leestma's opinion #3 shows that it is based entirely on his claim that he saw microscopic hemorrhages when he reviewed a slide of what he says was taken from Godinez's C2 to C4 region of the cervical spine. (Ex. 1 at 3; Ex. 2, 77:22-78:7). This opinion already fails the straight face test when compared with Dr. Leestma's deposition testimony that he actually cannot say that the slide that forms the basis for his opinion was actually from the C2 to C4. (Ex. 2, 75:24-76:11) ("Q: Do you know-you-specifically, your ultimate opinion in this case is based on your findings of the spine at C2 and C4 – between C2 and C4? A: …I can't be sure exactly what level that is, but it's the upper spinal cord. Q: Okay. Well your report says 'C2 to C4, correct? A: That's probably what it is."). But shockingly, Dr. Leestma's opinion fails on an even more fundamental level: the slide upon which Dr. Leestma says his entire causation opinion is predicated was not actually taken from the cervical spine at all.

Dr. Leestma acknowledged that the slides he reviewed were created by Dr. Mao, the neuropathologist the CCME retained as a consultant from Northwestern. (Ex. 2, 54:14-55:2). He even doubled down on this point and identified exhibit five of his deposition as a picture of the spine from which Dr. Mao took the cervical spine tissue for their subsequent analysis. (Ex. 2, 51:22-52:19, 54:7-55:2, 83:24-84:23). However, Dr. Mao reviewed the identical photograph of the spine (marked as exhibit two of her deposition) and unambiguously testified that it did not contain the cervical section of the spinal cord. (Deposition of Dr. Qinwen Mao at 18:11-20:24, attached hereto

10

as Exhibit 6). Moreover, Dr. Mao testified that she did not create any tissue block from the cervical spine. (Ex. 6, 76:5-8)(Q: Dr. Mao, good morning. To confirm, the only tissue blocks that you created were from the lumbar and thoracic spine of Mr. Godinez? A: Yes.). Dr. Elaine Bigio, the Neuropathology Medical Director at Northwestern, gave similar testimony, explaining that no part of the cervical section of the spinal cord was examined in this case. (Deposition of Dr. Elaine Bigio at 14:15-16:12, attached hereto as Exhibit 7). Thus, Dr. Leestma never had any slides from Godinez's cervical spine from which he could possibly claim to have "observed edema and small hemorrhages in Mr. Godinez's spinal cord near the location of the C2-C4 vertebrae, which indicate the early stages of a spinal cord injury." (Ex. 1 at 3).

The above described fundamental error that Dr. Leestma made in this case appears to stem from his inexcusable inability to distinguish the lumbar spine (near the rear) from the cervical spine (near the head). Dr. Leestma marked "CX" for cervical. (Ex. 2, 84:10-13). For illustrative purposes, embedded below are side-by-side images of identical photographs of Godinez's spine marked as exhibits two and five of the respective depositions of Doctors Leestma and Mao, together with an enlarged image of the cauda equine, which Dr. Mao marked as "CE"(Ex. 6, 19:13-24):

 

The cauda equina, sometimes referred to as "horse's tail," is a bundle of nerves at the lumbar region of the spine that splinters off into various nerve rootlets. (Ex. 6, 18:11-20:18). Dr. Mao used the above photograph, exhibit two of her deposition, to explain how she is able to anatomically determine that the cervical spine was not examined. (*Id.*) Using the relative size of a typical male spine, 45 centimeters ("cm"), against the typical brain, 15 cm, it is clear that approximately two-thirds of the spinal cord is not present in the photograph. (Ex. 6, 15:7-21). Since the right side of the spinal image contains the cauda equina and the spine is roughly the size of the brain, it can anatomically be determined that the cervical spine is not in the image. (Ex. 6, 18:11-20:18). Finally, Doctors Mao and Leestma each testified that it is not uncommon for neuropathologists to only receive a portion of the spinal cord when consulting with the CCME. (SOF ¶61).

Given the absence of any cervical spine from which Dr. Leestma would be able to analyze, there is no way for Dr. Leestma to say that the phrenic nerve was damaged, triggering paralysis of the diaphragm. (Ex. 1 at 3). And without evidence of damage to the cervical spine, a discussion of potential paralysis is a nonstarter. When Dr. Bigio was asked if she saw evidence of damage to the phrenic nerve in the photo, she responded, "Oh my goodness, no." (Ex. 7, 15:3-5). In essence, Dr. Leestma is making an opinion from a non-existent data source since the cervical spinal cord was not dissected or made part of the histology slides. Consequently, Dr. Leestma's entire opinion is inadmissible since he has no basis to conclude injury to the cervical spine: the necessary predicate to his speculative opinion that Godinez was paralyzed from the neck down and died of respiratory failure.

**B.      Dr. Leestma's Opinion Lacks Any Proper Methodology For Concluding SCIWORA Caused Godinez's Death.**

Even if Dr. Leestma's opinion about hypermobility were not unduly speculative and even if the slide from which Dr. Leestma based his opinion was actually from the cervical spine—two assumptions established above as unjustified—Dr. Leestma's next logic-defying leap lacks any reliable methodology.

### 1. Slide #11 Provides No Scientific Basis To Reliably Infer A Spinal Injury.

Dr. Leestma attempts to opine based upon his review of histology slide #11 that Godinez sustained a spinal cord injury that caused phrenic nerve paralysis and loss of diaphragmatic function. (Ex. 2, 68:7-17, 81:11-22). Even Dr. Leestma, however, cannot confidently state that this conclusion follows the scientific method so much so that it is capable of being reliably duplicated. Specifically, Dr. Leestma acknowledged that in a blind study (where he did not already know about the case), he could not confidently state that he would be able to review the slide and distinguish his observations from that of an infarct, which is attributable to cocaine use. (Ex. 2, 156:13-157:11). This is yet another independently sufficient basis to exclude Dr. Leestma. *Rosen v. Ciba–Geigy Corp.*, 78 F.3d 316, 319 (7th Cir.1996)("The courtroom is not the place for scientific guesswork, even of the inspired sort. Law lags science; it does not lead it.").

It warrants mentioning here that Dr. Leestma's interpretation of slide #11 is at odds with the opinions of Doctors Mao and Bigio, who determined based upon their review of all the slides that Godinez's spine was "unremarkable." (SOF ¶¶66-67). This is significant not only because it runs contrary to Dr. Leestma's opinion but it illustrates that his "observations" are not capable of being reproduced in a scientific manner. *Zenith Elecs. Corp. v. HW-TV Broad. Corp.*, 395 F.3d 416, 418 (7th Cir. 2005)(expert intuition is not testable "and conclusions that are not falsifiable aren't worth much to either science or the judiciary").

Given the absence of any discernable scientific method at play within Dr. Leestma's opinion, it is particularly notable that he also lacks any experience in diagnosing SCIWORA through microscopic slides or otherwise. Dr. Leestma has never even seen slide images similar to slide #11. (Ex. 2, 115:17-116:3). Perhaps this is because the SCIWORA diagnosis is exceedingly rare and usually found in cases involving young children. (Ex. 2, 176:16-18). According to a 2016 study of 297 patients with a SCIWORA, the mortality rate for those actually diagnosed with SCIWORA is just two percent. (Ex. 2, 177:1-6). In other words, 98 percent of those diagnosed with SCIWORA do not die. Dr. Leestma was unable to offer any statistics on the rates of SCIWORA in adults and, most importantly, in individuals Godinez's age. Tellingly, Dr. Leestma is not aware of any other case where an adult died from a spinal cord injury that was radiologically undetectable. (Ex. 2, 15:15-20). Similarly, Dr. Leestma is also not aware of any case where someone sustained diaphragmatic paralysis as a result of SCIWORA. (Ex. 2, 15:21-16:9).

Despite over 40 years of experience as a neuropathologist, Dr. Leestma has never given an opinion on manner and cause of death based on a review of histology slides let alone a single histology slide as he seeks to do in this case. (Ex. 2, 35:11-13). Dr. Leestma has never been admitted in a court to offer an opinion on cause of death based on a brain dissection. (Ex. 2, 36:1-5). Dr. Leestma says giving opinion on manner and cause of death is "not his job." (Ex. 2, 35:2-5). Further, Dr. Leestma has also neither diagnosed a SCIWORA nor is he even aware of the protocol to diagnose a SCIWORA. (Ex. 2, 9:13-10:14). In light of Dr. Leestma's utter absence of experience in interpreting similar findings on a slide, it would abrogate this Court's gatekeeping function to permit Dr. Leestma to provide his multi-layered, speculative opinion based upon nothing more than his word.

**2. Dr. Leestma Failed to Rule Out Cocaine Use as The Reason for The Microcirculatory Problem He Identifies in Slide 11.**

14

NMS Labs determined that Godinez had 1,400 ng/ml in his peripheral blood at the time of his death. (SOF ¶40). According to medical examiners Dr. Watkins and Dr. Denton, this quantity of cocaine alone is sufficient to find that cocaine was the cause of death. Dr. Leestma also failed to rule out cocaine toxicity as a potential cause of death. (SOF ¶¶44, 57). When asked if he attempted to rule out cocaine as a possible cause of death Dr. Leestma said, "It was a question that I asked, and I'm not qualified to answer it." (Ex. 2, 119:7-12). Dr. Leestma's inability to rule out other causes of death further disqualifies him from reaching cause of death opinions. *Yang*, 2017 WL 4283953, at *7 (This court bared doctor's opinion for failing to sufficiently explain why he excluded a heart attack as a possible cause of death).

Dr. Leestma claims a single histology slide, #11, is a snap shot of the early stage of a spinal cord injury that he classifies as SCIWORA which demonstrates Godinez was paralyzed. (Ex. 2, 81:11-17). However, at his deposition, Dr. Leestma explained that images of the early stages of a spinal cord injury caused by trauma would appear the same as the early stages of a spinal cord infarct. (Ex. 2, 156:3-19). An infarct is a small-localized area of dead tissue resulting from failure of blood supply. Dr. Leestma explained: "I can imagine a thought experiment where you could provide unlabeled, unidentified cases, and I'm not sure you'd tell the difference in the early -- in the early phases." (Ex. 2, 156:13-157:11). With regards to slide #11, Dr. Leestma said that he would not be able to tell the difference whether or not this was the early stage of an infarct or an actual spinal cord injury. (Ex. 2, 157:1-11). In other words, if Dr. Leestma looked at both of these images he could not say which photo represented the early stages of a SCIWORA or a cocaine-induced infarct.

Dr. Leestma acknowledged that spinal cord infracts have been reported with cocaine use and he has written about them in his book. (Ex. 2, 157:19-158:16). Nonetheless, Dr. Leestma does not

15

even account for the possibility of Godinez's supposed "microcirculatory" issue he identifies in slide #11 as being related to a spinal cord infarct, or rule it out as a possibility, despite overwhelming objective evidence that Godinez had cocaine in his system. As such, it is just as likely that the microcirculatory problems Dr. Leestma claims he observed on slide #11 are the early stages of a spinal cord infarct caused by Godinez's cocaine use. In other words, Dr. Leestma cannot exclude cocaine as the cause of the "microcirculatory problems" on slide #11. See *Yang*, 2017 WL 4283953, at *7.

### C.    Dr. Leestma's Opinion Also Required One To Speculate That The Phrenic Nerve Was Injured And That It Caused Bilateral Diaphragm Paralysis.

Yet another area of rank speculation required as a precursor to Dr. Leestma's ultimate causation opinion is the unsupported hypothesis that the phrenic nerve was actually injured. In fact, the opinion requires one to speculate that both aspects of the phrenic nerve were injured to such an extent that it caused paralysis to both sides of the diaphragm. These assumptions are unmoored from the scientific method and have no valid basis.

Even assuming the cervical spinal cord was examined (which it was not), a microscopic review of a single histology slide does not provide a scientific basis to conclude that the phrenic nerve was damaged. Dr. Leestma admits he never saw Godinez's phrenic nerves or any nerve cells associated with Godinez's spine. (Ex. 2, 85:15-22). The single photo that exists of the spinal cord does not provide Dr. Leestma with any insight on the location of the nerves. (Ex. 2, 86:4-22). Leestma is also not sure exactly of the location of Godinez's phrenic nerve. (Ex. 2, 87:5-10).

In order for Dr. Leestma's hypothesis to work, both sides of the phrenic nerve would need to be compromised in order to trigger paralysis on both sides of the diaphragm. But Dr. Leestma acknowledged that he has no way of knowing if this actually occurred. (Ex. 2, 93:15-20)(Q: Do you know for sure if the diaphragm was paralyzed? (Objection. Form.) A: I wasn't there, I had no

16

possibility of knowing. I am in—inferring and deducing that that is what's going on.) Moreover, because paralysis to both sides of the diaphragm would require damage to both aspects of the phrenic nerve, it would be doubly speculative to baselessly presume that both sides of the nerve were compromised. (Ex. 2, 88:10-16, 93:7-14, 100:13-21). In the end, Dr. Leestma concedes that based on the histology slide alone, there is no objective evidence that both sides of the phrenic nerve were even impaired. (Ex. 2, 97:2-16.)

**D.  Dr. Leestma Speculates How Long A Person Would Live After Diaphragm Paralysis.**

Even if we assume for the sake of argument that Dr. Leestma was certain that Godinez lost bilateral diaphragmatic function, Dr. Leestma still cannot opine on how long it would take for Godinez to stop breathing.  (Ex. 2, 95:19-97:1).  Dr. Leestma testified as follows:

> Q:    Okay. And so just because someone's diaphragm is paralyzed doesn't mean they are not able to breathe anymore?
> A:    It would severely limit their ability to breathe.
> Q:    A person that had a paralyzed diaphragm would not die suddenly --
>         MR. MORRISON: Objection Form.
> Q:    -- from a breathing issue --
>         MR. MORRISON: Speculation.
> Q:    -- correct?
>         MR. MORRISON: Speculation.
> A:    Depends on where the -- you know, at what level and how much phrenic nerve function and diaphragmatic function was impaired, and it would be it would be like saying from this moment right now, you can't breathe. How long would it take for you to become unconscious?··I don't know, minute, two minutes, three minutes I don't know, everybody is different. But it would be like having to hold your breath for that period of time.
>         ….
>         A: It's – it's possible, but -- and I can't tell you how much, but some people who have a high cervical injury can do some element of breathing. Whether it's enough to sustain them or not, I don't know.

(Ex. 2, 95:19-97:1).

Counsel's speculation objection is spot on.  Dr. Leestma is unable to offer any non-speculative, scientific evidence as to the consequence of loss of diaphragmatic function. Therefore,

17

he speculates how long someone will continue to breath after losing diaphragmatic function, and says it may be possible for a person with a high cervical injury to have enough breathing to sustain breathing. (*Id.*). Without knowing if Godinez lost function to both diaphragms, something Dr. Leestma cannot opine upon, Dr. Leestma cannot reach his cause of death opinion in this matter without additional, rank speculation. Moreover, even if he could show scientifically that Godinez in fact lost function to both diaphragms, which he cannot, there is still no evidence that Godinez died as a result of diaphragm paralysis because there is no evidence that has been presented that diaphragm paralysis causes sudden death. *O'Conner v. Commonwealth Edison Co.*, 13 F.3d 1090, 1106 (7th Cir. 1994)(An expert's testimony must be "subjected to the scientific method; it must rule out 'subjective belief or unsupported speculation.'"). Dr. Leestma's report and deposition offer no scientific evidence or opinion on how much longer someone would live after experiencing diaphragm paralysis.

### E. Dr. Leestma Concedes That He Cannot Rule Out Excited Delirium As The Cause of Death.

Dr. Leestma has a section in his book, *Forensic Neuropathology*, titled "Agitated Delirium." (Ex. 2, 127:21-129:4). Dr. Leestma testified that Agitated Delirium is the same as Excited Delirium. (Ex. 2, 127:21-128:4). According to Dr. Leestma, Agitated Delirium is a syndrome in which an individual is in a delirious, agitated state and behaves in a threatening or harmful manner to others or whose behavior constitutes a high potential for self-harm. (Ex. 2, 128:18-129:19). Despite having a section in his book regarding this diagnosis, Dr. Leestma does not account for or rule out this possibility in his analysis of this case or when arriving at his opinion as to Godinez's cause of death. In fact, he cannot rule out this possibility.

Dr. Leestma testified at deposition that Godinez "was certainly agitated and quite obviously not normal" and his actions of trying to scoot under the car, as seen on the video, had a high

18

potential for self-harm. (Ex. 2, 128:21-129:19). Dr. Leestma also explained that in cases of excited delirium, law enforcement is usually involved and attempting to subdue the person. (Ex. 2, 129:20-25.) Dr. Leestma acknowledged that under these circumstances, where police officers are trying to subdue a delirious individual, the person dies on scene or sometime later. (Ex. 2, 130:1-22). In this case, Godinez died a short while after the police attempted to subdue him. (*Id.*) Dr. Leestma explained further, that in the excited delirium cases, it is not uncommon for police to later be accused of wrongdoing, even if it is not just. (*Id.*) Dr. Leestma testified that there are several causes that put someone in a delirious state, such as alcohol, cocaine and/or combinations of the two. (Ex. 2, 131:15-132:3).

Godinez had alcohol and cocaine in his system at the time of death. (Ex. 2, 132:4-14). Dr. Leestma agreed that cases of excited delirium occur when a person is in the commission of a crime, and Godinez was reported to have broken into a garage just prior to the encounter with the police. (Ex. 2, 132:22-133:8). Dr. Leestma also conceded that it is well documented that cocaine toxicity can kill and even cause sudden death. (Ex. 2, 133:9-21). In excited delirium cases, one or more drugs in the system cause idiosyncratic, physiological responses to stress in the person. (Ex. 2, 138:3-13). Dr. Leestma said it was possible that Godinez could have had idiosyncratic, physiological responses to stress. (Ex. 2, 139:1-3). In light of Dr. Leestma's own writings on excited delirium syndrome, Dr. Leestma could not exclude it as a possible cause of death here. Dr. Leestma's testimony was as follows:

> Q: If you say in your book that the likely cause of death in these cases is one or more drug in the circulation and possibly idiosyncratic, physiological responses to stress in the victim, how do you exclude that as a possible cause of death in this case?
> MR. MORRISON: Objection. Form. What "these cases" are.
> A: Some -- those are hypotheses and theories. It may -- it may be virtually impossible to – you know, to prove one or the other.

19

(Ex. 2, 139:4-13).   As such, according to Dr. Leestma, excited delirium cannot be excluded as a potential cause of death.

### F.      Dr. Leestma's Methodology Fails To Account For The On Scene Witness Testimony That Godinez Was Moving Very Shortly Before His Death.

According to Dr. Leestma, the spinal cord injury he believes Godinez sustained would have caused instant loss of the use of his arms, legs and probably his body.  (Ex. 2, 94:2-95:4). However, Dr. Leestma's opinion is belied by witness accounts that acknowledge Godinez was moving after being carried outside the view of the Video.

There are three relevant time periods for the purposes of evaluating the possibility that Godinez could have become paralyzed: (1) the period captured on the Video; (2) the period where Godinez was carried from the alley to the police van, and; (3) the period that Godinez was in the police van before he was pronounced dead by EMS. While Dr. Leestma posits that paralysis occurred in the police van, he ignored *all* deposition testimony from witnesses who describe Godinez's actions while in the van. For instance, Officer LeAnthony Brown testified that Godinez was screaming, shouting, flailing, wailing back and forth the entire time on the way to the wagon (Dep. of LeAnthony Brown at 115:3-10, attached hereto as Exhibit 8), and Godinez continued shouting even after the wagon doors were closed. (Ex. 8, 141:16-142:4). Veronica Lopez, a civilian witness, testified that after being taking out of the alley, Godinez was screaming and yelling and was struggling when they put him in the wagon. (Dep. of Veronica Lopez at 76:11-17, attached hereto as Exhibit 9). After Godinez was placed in the wagon, Ms. Lopez heard banging, "like you're banging against a wall . . . more than three times." (Ex. 9, 34:21-25). There are more examples, but according to Dr. Leestma, witness accounts were inexplicably not important to consider.  (Ex. 2, 43:16-44:16).

Despite Dr. Leestma's complete failure to account for witness testimony that is contrary to his opinion, Dr. Leestma concedes he is unsure whether movement by Godinez up to eight minutes

before his death is consistent with his opinion. (Ex. 2, 121:19-122:15). According to the timeline established by these witnesses, EMS was at the scene and pronounced Godinez dead within 1-3 minutes of several witnesses seeing and hearing Godinez moving. (SOF ¶¶ 34-37). If Godinez was moving so close in time to his death, it would be yet another indicator that Dr. Leestma's speculative opinion that Godinez was paralyzed is unreliable. *See, e.g., Sommerfield v. City of Chicago*, 254 F.R.D. 317, 321 (N.D. Ill. 2008) ("Acceptance of the notion that an expert can reasonably base his opinion on summaries of deposition testimony prepared by a party's lawyer would effectively eliminate *Daubert's* insistence that an expert's opinion be grounded on reliable information."); *Equal Emp't Opportunity Comm'n v. Rockwell Int'l Corp.*, 60 F.Supp.2d 791, 795 (N.D. Ill. 1999) (expert report unreliable where expert's "sole source of information ... c[ame] from summaries prepared by one of the litigants" and expert failed to "review the entire depositions"); *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, No. 02–4356, 2010 WL 2607241, at *5 (N.D. Ill. June 23, 2010) (excluding expert report related to defendant's financial forecasts in part because expert "did not read any testimony about how [defendant] prepared its forecast" and "did not even read the deposition transcript" of the head of defendant's forecasting division).

## IV. DR. LEESTMA IS NOT QUALIFIED TO OPINE ON GODINEZ'S CAUSE OF DEATH.

An expert cannot offer testimony on topics for which he is not qualified. *See Happel v. Walmart Stores, Inc.*, 602 F.3d 820, 825-26 (7th Cir. 2010). For example, in *Happel*, the Seventh Circuit upheld the exclusion of a physician certified as both a neurologist and psychiatrist because he was testifying about the effects of stress on multiple sclerosis, and he had very limited experience with MS patients. *Id.*

Here, Dr. Leestma has no expertise in reaching opinions on hypermobility, nor has he ever diagnosed a SCIWORA. His only experience with SCIWORA, elicited by plaintiff's counsel, is

21

hearing about a friend/neighbor who "fell down some stairs and spent two days at the bottom of those stairs before his wife discovered him." (Ex. 2, 201:6-18). Illustrative of Dr. Leestma's penchant for speculation, Dr. Leestma claims he could diagnose that his neighbor sustained a SCIWORA without reviewing a single medical record or engaging in any actual methodology to test his conclusion. (Ex. 2, 200:22-201:18, 224:13-225:15).

Similar to his lack of experience diagnosing SCIWORA, Dr. Leestma has never diagnosed diaphragmatic paralysis and is not even aware of any scientific tests that allow for diagnosing diaphragm paralysis postmortem. (Ex. 2, 17:2-4,18:16-23). Dr. Leestma acknowledges he was not aware of any peer reviewed studies or literature that discusses diagnosing diaphragm paralysis at the neuropathology stage. (Ex. 2, 19:25-20:15). Putting all this aside, Dr. Leestma has no idea (scientifically speaking) how long it takes for someone to die after diaphragmatic paralysis and cannot identify literature on this topic. (Ex. 2 at p. 20:16-21:8). Dr. Leestma does not say how long Godinez was alive after this alleged diaphragm paralysis – because he does not know. As such, Dr. Leestma lacks basic qualifications to reach opinions on manner and cause of death in this case.

In sum, Dr. Leestma is being used to construct a manner and cause of death opinion based on matters he simply lacks the qualifications to make. *See, e.g., Goodwin v. MTD Products, Inc.*, 232 F.3d 600, 609 (7th Cir. 2000) (engineer was not qualified to give expert opinion concerning medical issues); *see also Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 705 (7th Cir. 2015) (treating physician was not qualified to testify as an expert witness regarding chronic asthma); *Cunningham v. Masterwear Corp.*, 569 F.3d 673, 675 (7th Cir. 2009) (respiratory doctor could not testify on toxicology); *Wilson v. City of Chicago*, 6 F.3d 1233, 1239 (7th Cir. 1993) (pathologist not qualified to testify on neurology, psychiatry, or physiology). Dr. Leestma's lack of qualifications to opine that a single histology slide

correlates to spinal cord injury, sufficient to cause phrenic nerve damage, leading to paralysis and death, is rivaled by his failure to employ scientific methodology to arrive at this speculative opinion.

## **CONCLUSION**

Ultimately, Dr. Leestma's opinions in this case are based upon multiple layers of unsupported speculation and, critically, upon a supposed histology slide of the cervical spine that does not actually exist. Even when Dr. Leestma is provided every benefit of the doubt, his opinions regarding neck hypermobility, Spinal Cord Injury Without Radiologic Abnormality ("SCIWORA"), and diaphragmatic paralysis lack the rigors of even rudimentary scientific methodology or proper application of scientific methods to the factual information in this case. In addition, Dr. Leestma is not properly qualified to provide the opinions being proffered here. Moreover, Dr. Leestma does not opine that any particular or collective action of the officers or of Godinez caused the supposed SCIWORA that he says actually caused Godinez's death. Instead, Dr. Leestma's opinions represent precisely the type of speculation and unreliable opinion this Court should bar because it is nothing more than attorney arguments thinly disguised as expert testimony.

Respectfully submitted,

*/s/ Avi T. Kamionski*
Avi T. Kamionski Atty. #6283191

Avi Kamionski
Shneur Nathan
Robin Shoffner
Christopher Wallace
Natalie Adeeyo
Nathan & Kamionski LLP
33 West Monroe, Suite 1830
Chicago, IL 60603
(312) 612-1928

23

**<u>List of Exhibits</u>**

Exhibit 1 – Report of Dr. Jan Leestma

Exhibit 2 – Deposition of Dr. Jan Leestma (Excerpt)

Exhibit 3 – Transcript in *People v. Mark Unger* 05-1955-FH (2012) (Excerpt)

Exhibit 4 – CCME Report of Postmortem Examination of Heriberto Godinez Jr.

Exhibit 5 – Deposition of LaTanja Watkins M.D(Excerpt)

Exhibit 6 – Deposition of Dr. Qinwen Mao (Excerpt)

Exhibit 7 – Deposition of Dr. Eileen Bigio (Excerpt)

Exhibit 8 – Deposition of LeAnthony Brown (Excerpt)

Exhibit 9 – Deposition of Veronica Lopez (Excerpt)

<u>**CERTIFICATE OF SERVICE**</u>

I, Avi T. Kamionski, an attorney, hereby certify that I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which sent electronic notification of the filing on the same day to all counsel of record.

/s/ Avi T. Kamionski
Avi T. Kamionski