**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

JANET GODINEZ, on behalf of herself and )
as administrator to the estate of her brother, )
HERIBERTO GODINEZ, Deceased, )
                                        )     No.     16 C 7344
          Plaintiff, )
                                        )
         v.                              )     Judge Pallmeyer
                                        )
The CITY OF CHICAGO, et al., )
                                        )
         Defendants. )

**DEFENDANT CITY OF CHICAGO'S
LOCAL RULE 56.1(a)(3) STATEMENT OF UNDISPUTED FACTS**

Defendant City of Chicago ("City"), by and through its counsel, Nathan & Kamionski, LLP, and pursuant to Local Rule 56.1(a)(3), hereby submits the following statements of undisputed material facts in support of its Motion for Summary Judgment on claims against the City of Chicago.

**Jurisdiction and Venue**

1. Jurisdiction by this Court and venue is proper because Plaintiff brings federal claims pursuant to 42 U.S.C. § 1983 and the events giving rise to the alleged claims occurred within the judicial district of the Northern District of Illinois. (Defendant City of Chicago's Answer to Plaintiff's Second Amended Complaint ("Ans."), Dkt. No. 272, Count I ¶¶1-2, 4-7, Affirmative Defense ¶8).

**Parties and Claims**

2. Janet Godinez ("Plaintiff") brings claims in this case on her own behalf and on behalf of the estate of her late brother, Heriberto Godinez ("Godinez"). (*Id.* at Count I ¶5). The City of Chicago ("City") is a defendant in this case under a direct liability theory pursuant to *Monell* as well as its capacity as the employer of Chicago Police Officers Keith M. Lindskog, James A. McAndrew,

Rodrigo J. Corona, Manuel Arroyo, Gerald J. Nowakowski, Todd A. Johnson, Brian A. Madsen, Samson F. Dadi, Mark Zdeb, Gerardo Calderon, Jr., Steve A. Schmid, Timothy McCollom, Robert Przybylowski, Kari Pfeifer, Salome Exclusa, LeAnthony Brown, Silvia Remigio, Michael Murphy, Donald Oksanen, Sergeant Michael T. Corlett, and Lieutenant Don Jerome who have been named as defendants in this case ("Defendant Officers"). (See *Id.* at ¶¶6-7).

3. Plaintiff brings claims of (I) excessive force under 42 U.S.C. § 1983; (II) failure to intervene under 42 U.S.C. § 1983; (III) supervisory liability under 42 U.S.C. § 1983; (IV) conspiracy to deprive constitutional rights under 42 U.S.C. § 1983; (V) policy claim against the City of Chicago; (VI) Illinois wrongful death; (VII) Illinois survival act claim-battery; and (VIII) Illinois survival act claim – intentional infliction of emotional distress. (*Id.* at ¶¶13-62).

## Undisputed Material Facts[1]

### A. Incident Background

4. On July 19, 2015, Mr. Godinez lived with his girlfriend, Ms. Erika Armas-Leanos for about two months at 39th Place; however, she packed up and left him the day before his death because of his drinking. (Deposition "Dep." of Erika Armas-Leanos, hereinafter Exhibit "Ex." 1, 15:23-16:8; 20:1-4). On two prior occasions, Ms. Erika Armas-Leanos threatened to leave Mr. Godinez when he confessed that he had been using cocaine. (Ex. 1, 19:19-25, 21:1-3, 24:11-13).

5. On the night of July 18, 2015 into the morning of July 19, 2015, Mr. Godinez was drinking, smoking marijuana, slurring his words, acting paranoid, and had not slept. (Ex. 1, 17:3-4; 17:9-10; 36:3-8; 37:10-38:4; 59:6-18; 59:19-60:3; 61:4-7; 61:11-14; 62:22-63:15; 67:8-68:8; 75:16-76:15; 93:7-8; Dep. of Jeronimo Palafox, Ex. 2, 37:5-10; 79:25-80:14).

---

[1] These facts are only admitted for purposes of summary judgment.

6. On July 20, 2015, at approximately 1:07 a.m., Chicago Police Officers James McAndrew and Keith Lindskog, assigned to beat 911R, responded to a 911 call of an assault in progress at 3100 W. 39th Place in the City of Chicago. (Dep. of James McAndrew, Ex. 3, 167:20-24; Dep. of Keith Lindskog, Ex. 4, 113:16-19; Report of the Cook County State's Attorney's Office ("CCSAO") Dated September 8, 2016, Ex. 5 at 2, 22-24).

7. Officers McAndrew and Lindskog parked their police SUV behind a garage located at 3855 S. Albany where they heard "crashing" from inside a garage. (Ex. 3, 176:5-177:7). Godinez, then came out of the garage, where Lindskog handcuffed Godinez without incident. (Ex. 3, 177:8-178:6; 178:14-21, 181:7-183:18).

8. When Officers McAndrew and Lindskog first encountered Godinez, he was wearing a white tank top and red shorts, had some blood by his mouth, and was sweating. (Ex. 3, 179:24-181:10; 182:1-3; 183:19-24).

9. Officers Rodrigo Corona and Manuel Arroyo, assigned to Beat 921R, drove into the alley and parked their vehicle behind Beat 911R's vehicle. (Dep. of Rodrigo Corona, Ex. 6, 182:10-22; Dep. of Manuel Arroyo, Ex. 7, 135:20-136:1).

10. Officers Lindskog and Arroyo then left the alley to investigate whether Godinez had permission to be in the garage. (Ex. 3, 184:12-16; Ex. 4, 132:10-21, 133:6-21, 149:10-23; Ex. 7, 152:2-9). They spoke with the owners of the garage and confirmed that Godinez did not have permission to be in the garage. (Ex. 7, 167:17-168:3).

11. Oscar Cruz lived at 3855 S. Albany on July 19-20, 2015, and testified that he and his father Leopoldo Cruz-Santana did not know Godinez. (Dep. of Oscar Cruz, Ex. 8, 7:3-8:5, 20:18-23; 73:7-9). Officer Arroyo testified that Cruz-Santana told him Godinez did not have permission to be inside the garage. (Ex. 7, 167:17-21).

12. The front-facing in-car camera located in Beat 921R's vehicle (the "Video") recorded certain actions of both Godinez and various officers over the next 18 minutes. (Beat 921R Dash Camera Video Dated July 20, 2015, Ex. 10; Plaintiff's "Pl.'s" Response "Resp." to City's Requests for Admission, Ex. 9, ¶5).

13. Officers Todd Johnson, Brian Madsen and Gerald Nowakowski, assigned to Beat 993, also responded to the alley and interacted with Godinez. (Dep. of Todd Johnson, Ex. 11,110:16-18, 132:7-17, 174:1-8; Dep. of Brian Madsen Vol. 2, Ex. 12, 129:21-24; Dep. of Gerald Nowakowski, Ex. 13, 126:23-127:5).

**B. The Video[2]**

14. The Video shows Godinez restrained in handcuffs, lying face down, and rocking his body from side to side at the time that Officers Corona and Arroyo arrive in the alley. (Ex. 10, at 6:00-6:10). Godinez at this point was lying in front and to the left of Beat 911R (license plate 9593). (*Id.*) Godinez then sat himself up, (Ex. 10, at 7:50), and eventually began to scoot himself toward the back of Beat 911R before an officer guided Godinez onto his back. (Ex. 10, at 9:00-9:35).

15. While still handcuffed, Godinez then struggled with two officers, McAndrew and Corona, until Godinez placed his head under Beat 911R, by the driver's side tailpipe, at which point Officer Corona put his foot on Godinez's head area for approximately 2 seconds. Ex. 10, at 9:35-9:54; Ex. 6, 231:4-7, 233:10-18; 234:9-13).

---

[2] The in-car camera video recording captured by Beat 911R's patrol vehicle lists an incorrect time throughout the recording. The time on screen is approximately one hour and four minutes behind the actual time of the incident. The time as referenced in this Statement of Facts reflects the time elapsed on the video player for ease of reference.

16. Officers McAndrew and Corona continued to struggle with Godinez, with Officer Corona crouching and attempting to restrain Godinez's kicking feet and Officer McAndrew crouching near Godinez's hands. (Ex. 10, at 9:52-10:36; Ex. 3, 198:11-199:1; Ex. 6, 234:22-235:13).

17. Officer Corona called for a wagon to transport Godinez. (Ex. 3, 199:16-200:4; Ex. 6, 250:4-13).

18. Additional officers then arrived on scene, including Officers Johnson, Madsen, and Nowakowski. (Ex. 10, at 10:35-10:46; Ex. 3, 200:18-22; Ex. 6, 236:20-237:8).

19. While Godinez continued to struggle, Officer Johnson entered the area where Godinez was laying on the ground, turned toward the camera, placed his hands back on Beat 911R, then shifted his body position so that his right foot was on Godinez while his left foot was on the ground. (Ex. 10, at 10:41-12:05; Ex. 11, 241:2-17, 242:2-8).

20. Officer Madsen then left to get flex cuffs to restrain Godinez's legs. (Ex. 10, at 11:43; Ex. 12, 199:21-22; Ex. 13, 156:9-16).

21. Officer Johnson then appears to reposition himself to keep his weight on Godinez's shoulder while Godinez continued to move his torso and hands. (Ex. 10, at 12:05-13:47).

22. While Officer Johnson had at least some of his body weight on Godinez, Officers Nowakowsi and Madsen placed flex cuffs on Godinez's legs. (Ex. 12, 202:8-16; Ex. 13, 157:8-20). After repositioning himself, Officer Johnson had his foot and weight on Godinez's body for less than two minutes. (Ex. 10, at 12:05-13:47; Report of Dr. J. Scott Denton Dated April 18, 2016, Ex. 14 at 3).

23. After applying the flex cuffs, for approximately 4 minutes and 9 seconds, several officers stood around Godinez who, though not clearly visible throughout this entire time, appeared to stop kicking and struggling. (Ex. 10, at 13:47-17:56).

5

24. Suddenly, Godinez started kicking his legs up and wiggling his body underneath the tailpipe of Beat 911R. (Ex. 10, at 17:56-18:02). While lying with his stomach directly under the tailpipe, Godinez turned his body and head 180 degrees and pressed his hips up with enough force that the vehicle itself moved slightly upward. (Ex. 10, at 18:02-18:20).

25. Officer McAndrew then pulled Godinez out from under Beat 911R, (Ex. 10, at 18:20-18:24; Ex. 3, 213:21-214:6). Godinez's shorts were inadvertently pulled down while Officer McAndrew pulled Godinez from underneath the exhaust pipe of Beat 911R. (Ex. 10, at 18:24-18:33).

26. Lieutenant Jerome, who had arrived at the scene, began to think that Godinez was having a "mental health issue" after Godinez shoved himself underneath Beat 911R. (Dep. of Don Jerome, Ex. 15, 171:10-172:1, 177:4-15).

27. After Officer McAndrew pulled Godinez out from under the vehicle, multiple officers, including McAndrew, Calderon, Corona, and Lindskog, carried Godinez, who was still moving and struggling with officers, outside the view of the camera. (Ex. 10, at 18:33-18:58; Ex. 3, 214:18-216:3, 217:15-218:8).

28. Godinez was alive "the entire time on video." (Dep. of Dr. Michael Baden, Ex. 16, 86:1-7; Ex. 10, at 6:00-18:58).

## C. Additional Testimony From The Scene

29. After Godinez was carried outside the view of the Video, Officers McAndrew, Calderon, Corona, Lindskog, and LeAnthony Brown directly carried Godinez approximately 60 feet to the police transport van/wagon. (Ex. 3, 214:22-216:24; Ex. 4, 170:21-171:8, 171:12-14; Dep. of Gerardo Calderon, Ex. 17, 158:8-159:5). During this time, Godinez was constantly flailing and "screaming". (Dep. of LeAnthony Brown, Ex. 18, 104:23-105:13; Ex. 4, 171:15-21; Dep. of Veronica Lopez, Ex. 19, 76:11-24).

30. When the officers arrived at the wagon with Godinez, they lifted Godinez into the wagon so that he was "laying headfirst down" with his "head towards the front" of the wagon before he turned so his head was facing the back of the wagon. (Ex. 3, 223:22-224:15).

31. Godinez was then turned onto his left side, (Ex. 3, 226:1-5), and the wagon cage door was closed but the exterior "swing doors" remained open while Godinez was left alone in the wagon. (Ex. 3, 229:16-21, 237:13-19; Ex. 6, 226:19-21).

32. The officers could not secure Mr. Godinez in a seat belt because he continued struggling, flailing, and shouting incoherently inside the wagon. (Ex. 18, 130:13-131:4; Ex. 4, 175:2-10; Ex. 15, 184:1-6; Ex. 6, 215:8-216:15; Dep. of Steve Schmid, Ex. 21, 132:14-133:12; Ex. 3, 225:3-7; Dep. of Mark Zdeb, Ex. 20, 80:7-17).

33. After Godinez was taken to the transport wagon, Lieutenant Jerome noticed his breathing was "maybe just a little bit labored" meaning "just breathing a little heavy" before he started "breathing normally again." (Ex. 15, 187:7-188:22). It was at this point, in conjunction with the fact that Godinez was still thrashing around, could not be properly secured, and that this was a mental health transport, that Lieutenant Jerome decided to call for an ambulance. (Ex. 15, 186:13-187:1, 188:14-22; Ex. 6, 221:5-14).

34. The ambulance was requested "right after [Godinez] was put in the wagon." (Ex. 3, 240:16-19). Officer Corona believed it was he who called for the ambulance. (Ex. 6, 221:15-17, 253:24-254:1).

35. After officers exited the wagon and the cage of the wagon was closed, Mr. Godinez continued kicking until shortly before the ambulance arrived.  Ex. 3, 231:1-232:1, 233:5-23).

7

36. After the officers left Godinez inside the wagon, Veronica Lopez, a civilian who lived nearby, testified she heard banging, "like you're banging against a wall more than three times." (Ex. 19, 34:18-25).

37. The ambulance arrived at the scene at 1:33 a.m. (Chicago Fire Department Run Sheet, Ex. 22 at 1).

38. When Paramedic Jason Powell went to the van, Godinez was lying on his left side with his shoulder on the ground and his back against the passenger bench. (Dep. of Jason Powell, Ex. 23, 34:18-35:3).

39. Paramedic Powell and his partner checked Godinez's pulse, his eyes, and his chest, and at that point determined that Mr. Godinez wad dead. (Ex. 23, 39:12-18).

## D. Findings Of Non-Retained Forensic Pathologists

### Medical Examiner Dr. LaTanja Watkins

40. The Cook County Medical Examiner's Office ("CCME") conducted a review of Godinez's cause and manner of death. As part of the CCME review, NMS Labs conducted a toxicology analysis of Godinez's blood. (CCME Report of Postmortem Examination of Heriberto Godinez Jr., Ex. 24 at 7). The results of this toxicological examination found in Godinez's blood 1400 nanograms ("ng") of cocaine per milliliter ("ml"), 97 mg/dl of ethanol in the vitreous humor and 55 mg/dl in the blood, 170 ng/ml of cocaethylene, and 2.2 ng/ml of THC/marijuana. (NMS Labs Toxicology Report of Heriberto Godinez Jr., Ex. 25 at 1; Dep. of Dr. LaTanja Watkins, Ex. 26, 60:19-25; 64:5-70:1, 86:22-24, 89:3-14).

41. According to the data from NMS Labs, in the year 2015, "When comparing Mr. Godinez's postmortem peripheral blood concentrations against all other postmortem measurements from 2015 it was found that: For cocaine 1878/1923 (97.6%) of cases had cocaine concentrations lower than

that of Mr. Godinez." (Report of NMS Labs Toxicologist Dr. Daniel Isenschmid Dated June 19, 2019, Ex. 27 at 1).

42. When comparing Godinez's postmortem peripheral blood concentrations against all other DUI cases collected by NMS Labs from the year 2015, "For cocaine all 512 (100%) DUI cases had cocaine concentrations lower than that of Mr. Godinez." (Ex. 27 at 2.) "Mr. Godinez's postmortem cocaine concentration exceeded any of those observed [by NMS Labs in 2015] for recreational cocaine use in the driving population and his cocaethylene concentration exceed all but one in the same population. (*Id.*)

43. Dr. LaTanja M. Watkins of the CCME conducted an autopsy on Godinez and issued a report that concluded:

> In summary, the substantial factor in this death was ethanol and cocaine toxicity. The use of these substances predisposed Mr. Godinez to a lethal dysrhythmia. There is also evidence that Mr. Godinez was intensely exerting himself while apprehended and this activity was most likely associated with elevated serum catecholamines. While the factors listed would support a manner of death finding as Accidental, the actions of the arresting officers prior to and following the available video footage may also have resulted in physical stress on the body, despite the fact that there were no lethal injuries or evidence of asphyxia. Many of the injuries noted would be compatible with those received while struggling on a paved surface. Lastly, it is unknown if Fahr's mineral vascularization or a "stroke" contributed to his death. For these reasons:
>
> MANNER OF DEATH: UNDETERMINED .

(Ex. 24 at 11).

44. According to Dr. Watkins, the primary cause of death was considered alcohol and cocaine intoxication, and this finding alone would have been suitable as the cause of death. (Ex. 26, 86:22-24, 89:3-14).

45. Dr. Watkins provided additional insight at her deposition regarding the meaning of the language "physical stress associated with restraint" as that phrase was used in her report. (Ex. 24 at 8; Ex. 26, 70:5-71:10). According to Dr. Watkins, the term "physical stress associated with restraint" refers to the restraint devices put on the wrists and ankles; non-specific contusions, abrasions, and lacerations; Godinez's agitation and self-injury during arrest; and unexpected death. (Ex. 26, 70:5-71:10; 92:25-94:18).

46. Dr. Watkins opined that none of the abrasions, contusions or lacerations on Godinez's body were lethal, and that these injuries could not be attributed to any actions of the Defendant Officers. (Ex. 26, 95:5-12, 131:25-132:14).

47. The radiographs taken by the CCME after Godinez's death show no evidence of fracture to Godinez's neck. (Ex. 26, 83:5-16; X-Ray Images of Heriberto Godinez, Ex. 28).

48. Upon dissection of Godinez's neck, Dr. Watkins found the ligaments intact and normal. (Ex. 26, 48:6-8). Dr. Watkins explained that sometimes people have "palpable laxity" of the neck or "loose neck" at autopsy because of decomposition. (Ex. 26, 271:5-20).

49. Dr. Watkins found no evidence of asphyxia in her autopsy examination. (Ex. 26, 94:19-21). She explained that she viewed the finding of global hypoxic injury to be insignificant because it was part of the "natural process of dying." (Ex. 26, 79:7-18).

### Dr. J. Scott Denton

50. The Cook County State's Attorney's Office ("CCSAO") retained board certified forensic pathologist J. Scott Denton, M.D., to conduct a review of the death of Godinez and provide an "honest, open opinion of what [Denton] thought." (Dep. of Dr. J. Scott Denton, Ex. 29, 164:1-8; Ex. 14; Curriculum Vitae of Dr. J. Scott Denton, Ex. 30). Dr. Denton is licensed to practice medicine in Illinois and Wisconsin and has performed over 10,000 autopsies. (Ex. 29, 7:23-25, 9:8-

16). He has testified as an expert in the field of forensic pathologist over 400 times. (Ex. 29, 155:6-156:2).

51. Among the materials Dr. Denton reviewed were the CCME Report relating to Godinez, the autopsy photographs, scene photographs, the NMS Labs toxicology report relating to Godinez, radiographs relating to Godinez, and the Video. (Ex. 14 at 1-2).

52. Dr. Denton opined that the 1,400 ng/ml of cocaine in Godinez's peripheral blood as determined by a "very reputable and accredited lab" (NMS Labs) was "a very high concentration of cocaine" and noted that "[r]eported fatal concentrations of cocaine in the blood vary widely and range from 100-333,000 ng/ml." (Ex. 14 at 4-5; Ex. 29, 192:11-17).

53. Dr. Denton opined "that the external injuries Mr. Godinez sustained were superficial and related to his own actions, and that he sustained no significant internal injury related to the restraint." (Ex. 27 at 2; Ex. 29, 119:15-120:16).

54. Dr. Denton explained that the "small scattered hemorrhages through the entire soft tissues of the body" … "appear as early decomposition change or disseminated intravascular coagulation related to hyperthermia." (Ex. 14 at 4). Dr. Denton further explained that the mild laxity in Godinez's neck was not due to a broken neck or dislocation; rather, it was "from hyperthermia and lack of rigor mortis." (Ex. 29, 81:1-82:18; Ex. 14 at 4).

55. At his deposition, Dr. Denton explained that bilateral hemorrhaging in the tissue surrounding the carotid arteries had no clinical significance because this hemorrhaging is seen throughout "the entire body." (Ex. 29, 190:12-191:15). The hemorrhaging scattered through the body was due to decomposition and hyperthermia. (Ex. 29, 224:19-225:10; Ex. 14 at 4). Dr. Denton further opined that petechia are caused by "[l]ots of things. Pressure, gravity, early decomposition change." (Ex. 29, 52:4-6).

56. Dr. Denton found that "[t]he brain examination showed generalized edema" and opined that "[t]hese autopsy findings are inconsistent with a restraint-related death, and most consistent with an acute cocaine intoxication." (Ex. 14 at 4). Dr. Denton explained in his deposition that "global hypoxic ischemic injury" is a clinical way of describing what a forensic pathologist would describe as "generalized edema" in the brain or "cerebral edema." (Ex. 29, 219:25-220:21).

57. Dr. Denton concluded, "that the cause of death for Mr. Heriberto Godinez is best certified as cocaine intoxication and the manner of death is best certified as accident. (Ex. 14 at 7). There is no physical evidence that the restraint actions of the police caused or contributed to his post-restraint cocaine intoxication-related fatal cardiac arrhythmia while in the stationary transportation van." (*Id.*, 7).

### Dr. Qinwen Mao

58. Dr. Qinwen Mao, M.D., PhD, is an assistant professor of pathology at Northwestern's Feinberg School of Medicine and is board certified in anatomic pathology and neuropathology. (Curriculum Vitae of Dr. Qinwen Mao, Ex. 31; Dep. of Dr. Qinwen Mao, Ex. 32, 6:22-7:2, 10:1-22). Dr. Mao was retained by the CCME in this case as a consultant in the field of neuropathology. (Report of Dr. Qinwen Mao Dated August 18, 2015. Ex. 33; Ex. 32, 12:17-13:1).

59. In August of 2015, as part of her consulting duties for the CCME, Dr. Mao conducted an examination of Godinez's brain and a portion of his spinal cord. (Ex. 32, 6:22-7:20; 24:14-16). Dr. Jan Leestma, then a consultant for Plaintiff, was present for a portion of this examination. (Dep. of Dr. Jan Leestma, Ex. 34, 49:2-5).

60. Doctors Mao and Leestma reviewed a portion of Godinez's spinal chord ("Cord Photo"). (Cord Photo, Ex. 35; Dep. of Dr. Jan Leestma, Ex. 34, 48:12-49:5; Ex. 32, 18:11-18). This portion of the spinal cord depicted in the Cord Photo shows portions of the thoracic and lumbar spine but

does not include any portion of the cervical spine, including the C1-C4 region of the cervical spine. (Ex. 32, 19:13-21:18; 23:10-24:5; 76:5-8; Dep. of Dr. Eileen Bigio, Ex. 36, 15:3-16:6).

61. The phrenic nerve is located in the C1-C4 region of the spine. (Ex. 16, 30:13-23; Report of Dr. Jan Leestma, Ex. 37 at 3). Dr. Mao did not review the C1-C4 region of the spine or the phrenic nerve because such a review was not possible based on the available portions of Godinez's spinal cord depicted in the Cord Photo. (Ex. 32 22:3-8, 23:10-24:5; 24:23-25:3; 95:10-12). It is not uncommon for the CCME to only preserve a portion of the spinal cord for review by forensic neuropathologists. (Ex. 32, 17:13-22; Ex. 34, 190:24-191:21; Ex. 36, 13:9-13).

62. Dr. Mao cut portions of the brain and spinal cord from the pathological material depicted in the Cord Photo. (Ex. 32, 16:21-17:6; Ex. 34; 106:20-24). Microscopic slides were created from these cuttings by technicians at the CCME. (Ex. 32, 17:7-12; Ex. 34, 54:14-55:2).

63. Dr. Mao reviewed the microscopic slides of the available portions of Godinez's brain and spinal cord. (Ex. 33 at 1-2). With respect to Dr. Mao's microscopic examination of the brain, she found "scattered red neurons" that were consistent with "acute global hypoxic/ischemic injury." (Ex. 33 at 2; Ex. 32, 55:16-23).

64. At her deposition, Dr. Mao explained that her references to the terms "scattered red neurons" and "acute global hypoxic/ischemic injury" in her report were not intended to describe findings of clinical significance and are not evidence of asphyxia. (Ex. 32, 75:6-21; 97:25-98:13). Dr. Leestma stated during his deposition that the finding of "acute global hypoxic/ischemic injury" could be caused by "many processes" including cocaine intoxication, spinal cord injury, or cardiac arrest." (Ex. 34, 213:12-23).

65. Dr. Mao made no finding that Godinez sustained a traumatic brain injury. (Ex. 33 at 2; Ex. 32, 53:18-54:10).

13

66. With respect to her microscopic examination of the spinal cord and its outer layer known as the dura, Dr. Mao found them "unremarkable," meaning the dura did not contain any lesions. (Ex. 33 at 2; Ex. 32, 28:5-14; 61:15-20).

67. Dr. Elaine Bigio, is the medical director of the neuropathology department at Northwestern's Fienberg School of Medicine. (Ex. 36, 7:11-20). Dr. Bigio reviewed the findings of Dr. Mao and concurred with Dr. Mao's findings. (Ex. 36, 16:18-17:19).

**E. Plaintiff's Monell Claims**

68. Plaintiff in this case brings a *Monell* policy claim against the City alleging that the City caused the death of Godinez because, "as a matter of both policy and practice[,]" the City encourages officers to commit excessive force by (a) failing to adequately investigate and discipline officers relating to in-custody civilian deaths; (b) maintaining a "code of silence" amongst officers (c) failing to properly use, maintain, and monitor Chicago police dashboard video and audio recording equipment; and (d) using unlawful restraint techniques that are known to cut off a subject's breathing. (Second Amended Compl. ("SAC"), Ex. 38, ¶¶36-48, Dkt. No. 159).

**F. Chicago Police Department General and Special Orders in Effect in July 2015**

69. On July 20, 2015, Chicago Police Department General Order G03-02 regarding "Use of Force Guidelines" was in effect and provided, in relevant part, the following:

   a. "A peace officer … is justified in the use of any force which he reasonably believes to be necessary to defend himself or another from bodily harm while making [an] arrest." (Chicago Police Department General Order G03-02, Ex. 39, ¶II).

   b. "Department members will use an amount of force reasonably necessary based on the totality of the circumstances to … effect an arrest, overcome resistance, control a subject, or protect themselves and others from injury." (*Id.* at ¶III(B)).

   c. "Reasonableness is not capable of a precise definition or mechanical application. Circumstances that may govern reasonableness of using a particular force option include, but are not limited to … (b) whether the subject poses an immediate threat to the safety of other officers of others, (c) whether the subject is actively resisting arrest or attempting to evade arrest by flight." (*Id.* at ¶¶III(C)(1)(b) and (c)).

14

70. On July 20, 2015, Chicago Police Department General Order G03-02-02 regarding "Force Options" was in effect and states, in relevant part, as follows:

    a. "This directive: … (B) clarifies the Department policy on the use of chokeholds." (Chicago Police Department General Order G03-02-02, Ex. 40, ¶I(b)).

    b. "Members will select the appropriate level of force option based on a subject's actions and modify their selection of options as the subject offers less or greater resistance." (Ex. 40, ¶II(C)).

    c. "Department members will not use chokeholds to subdue a subject unless deadly force is justified, consistent with Item III-C-3 of this directive." (Ex. 40, ¶II(D)).

    d. "Chokeholds are only justified as a use of deadly force.

        i. A chokehold is defined as applying direct pressure to a person's trachea (windpipe) or airway the front of the neck with the intention for reducing the intake of air. (Ex. 40, ¶¶III(C)(3)(b)(1)).

        ii. Holding and control techniques involving contact with the neck, but which are not intended to reduce the intake of air, are not defined as chokeholds. (Ex. 40, ¶¶III(C)(3)(b)(2)).

71. On July 20, 2015, Chicago Police Department Special Order S03-05 regarding "In-Car Video Systems" was in effect and provided, in relevant part, as follows:

    a. "The in-car video system will automatically engage audio and video recording when the vehicle's emergency-roof lights are activated. However, Department members may manually activate in-car video system without the activation of the emergency equipment." (Chicago Police Department Special Order, S03-05, Ex. 41, ¶III(B)).

    b. "The Records Division will be the custodians of the digitally recorded data and will be responsible for the retention, duplication, and viewing of in-car systems. The Director, Records Division, will establish retention, viewing and duplication procedures that provide for inventory control, the security of the digitally recorded data, and authorized duplications." (Ex. 41, ¶III(C)).

    c. "When downloading digitally recorded data from the mobile unit of an in-car system to a land-based terminal, Department members will:

        i. download the data in accordance with the manufacturer's guidelines and training. (Ex. 41, ¶VII(A)(1)).

        ii. ensure the download of data was complete and return the vehicle back into service." (Ex. 41, ¶VII(A)(2).

15

d. "With the approval of the station supervisor in the district of the occurrence, special requests for the immediate viewing of digitally recorded data from…IPRA will be processed for major incidents where an in-car system may be reasonably expected to capture a component of the incident." (Ex. 41, ¶VII(B)).

e. "Department members will place an extended hold on digitally recorded data recorded using the postevent pop-up menu on the in-car system." (Ex. 41, ¶VIII(A)).

f. "Within the first 48 hours from downloading digitally recorded data from the vehicle, Department members who do not use the postevent pop-up menu and request an extended hold on digitally recorded data will request that a supervisor place the extended hold by using the land-based terminal at the district/unit station." (Ex. 41, ¶VIII(B)).

g. "After the first 48 hours from downloading digitally recorded data from the vehicle, Department members who do not use the postevent pop-up menu request hold on digitally recorded data will:

   i. Complete the Digitally Recorded Data Viewing/Hold/Duplication Request form. (Ex. 41, ¶VIII(C)(1)).

   ii. Indicate on the form the necessary actions by the Records Division. (Ex. 41, ¶VIII(C)(2)).

   iii. Explain in the narrative portion of the form the reason for the request. (Ex. 41, ¶VIII(C)(3)).

   iv. Submit the form to the station supervisor/designated unit supervisor for approval. (Ex. 41, ¶VIII(C)(4)).

   v. Submit the completed form to the Records Division for processing and retention in accordance with existing-retention requirements." (Ex. 41, ¶VIII(C)(5)).

h. "Department members who wish to remove an extended hold on digitally recorded data will follow the procedures outlined in Item VIII-C of this directive indicting the circumstances requiring the removal of the extended hold." (Ex. 41, ¶VIII(D)).

## G. *Monell* Discovery In This Case

72. On February 14, 2017, Plaintiff submitted Responses to Defendant City of Chicago's Interrogatories to Plaintiff which sought, among other things, the evidence upon which plaintiff would rely in support of each aspect of their *Monell* policy claim allegations. In response to each allegation Plaintiff stated that she would rely on documents bates-stamped HLO000455-000842, as well as "other documents submitted and/or tendered … deposition transcripts … and experts."

16

(Plaintiff's Responses to Defendant City's 2nd Interrogatories, Ex. 42, ¶¶ 20, 21, 22, 23, 24). The documents set forth in HLO 455-842 consist of the district court's decisions in *Obrycka v. City of Chicago* (07 C 2372), the April 2016 Police Accountability Task Force Report ("PATF"), and the Jan. 13, 2017 Department of Justice Report ("DOJ").

73. Charles Drago is Plaintiff's retained expert who issued opinions related to the officers' use of force in a report dated April 25, 2019 ("Drago Report"), and opinions related to the Monell policy claims against the City in a supplemental report ("Addendum Report") dated May 31, 2019. The Addendum Report adopts and incorporates the Drago Report in its entirety. (Charles Drago Expert Report Dated April 25, 2019, Ex. 43; Charles Drago Addendum Report Dated May 31, 2019, Ex. 44).

74. The Addendum Report contains the following four opinions related to Monell Policy claims against the City: 1) failure to provide adequate and proper supervision of Chicago police officers in the use of force and otherwise; 2) failure to train Chicago police officers in the proper use of the vascular neck restraint (carotid compression); 3) failure to train Chicago police officers in the proper restraint techniques and procedures regarding positional asphyxia; and 4) the existence of an unofficial "code of silence" within the Chicago Police Department at the time of this event. (Ex. 44, ¶¶ 2, 5-6).

75. Mr. Drago neither identified any written or express policies within the Chicago Police Department which were unconstitutional, nor did he acknowledge the investigation undertaken by IPRA/COPA into the death of Mr. Godinez. (Ex. 44, ¶¶ 2-5, 8).

76. The Addendum Report states that "[i]t is not unusual to have some semblance of protectionism or a code of silence in many police departments across the country" (¶37), and that

"[t]he Code of Silence can be found in some degree in police agencies across the country." (Ex. 44, ¶46).

77. The Expert Report and Addendum Report list the following materials as reviewed, considered, relied upon, or referenced by Mr. Drago in drafting his report: unspecified CPD general orders, rules and regulations; training materials related to handcuffing, resister and takedown drills; complaint history, training records and depositions of defendant officers; and, the Department Of Justice ("DOJ") Report on the Chicago Police Department and the Police Accountability Task Force ("PATF"). (Ex. 44 at 9-10).

78. Other than the civil rights case regarding Heriberto Godinez, the only other cases Mr. Drago refers to by name in his Addendum Report are Antonio LeGrier, Devonte James, and LaQuan McDonald. (Ex. 44, ¶¶14, 15, 40).

79. The City trains its officers on permissive control tactics, the proper procedures for cooperative and emergency cuffing, and the prevention of positional asphyxia. On March 15, 2019, the City produced these training materials to the Plaintiff in response to Plaintiff's Third Set of Documents Requests. (City's Response to Plaintiff's Third Set of Document Requests to Defendant City, Ex. 45 at 5; Chicago Police Department Training Materials and Directives, Ex. 46).

80. Pursuant to the Plaintiff's request, the City conducted a search for investigative files related to all non-shooting, death-in-police-custody cases for the time period of January 1, 2012 to December 31, 2015, including two cases from 2000 and 2004 regarding allegations of positional asphyxia. On March 15, 2019, the City produced a list of "Extraordinary Occurrences" ("EO") files as well as files IPRA/COPA/OPS categorize as 4H and 4Z cases, totaling 144 files. (Ex. 45 at 2).

81. The City's policy is that officers must activate in-car video systems to audibly and visually record entire incidents for all enforcement stops. The City produced this protocol regarding in-car

camera systems to Plaintiff on March 15, 2019, including disciplinary records and investigations regarding officers' in-car camera usage. (Ex. 45 at 4-5; Ex. 46 at 34-42).

## H. IPRA/COPA Investigation

82. Prior to July 20, 2015, the City of Chicago enacted an ordinance creating the Independent Police Review Authority ('IPRA"), empowering IPRA to, inter alia: a) receive and register all complaints filed against Chicago Police personnel; b) conduct impartial investigations into complaints concerning allegations of excessive force and any death of a person that occurs while in police custody; and c) submit a final report including recommendations for sustained findings. (Chicago Municipal Code, Chapter 2-57, Independent Police Review Authority, Ex. 47).

83. Investigator Michael Goldston was an investigator for IPRA and its predecessor agency, the Office of Professional Standards ("OPS"), for 30 years until he retired in 2017. (Dep. of Michael Goldston, Ex. 48, 12:6-24, 13:10-24). During that entire time period, Goldston's responsibilities were to "conduct a thorough, impartial investigation of whatever incident and upon completion of the investigation, to submit a final report, including our recommendations for findings." (Ex. 48, 16:10-16).

84. On July 20, 2015, at approximately 2:31 a.m., CPD Officer Kenneth Molesky contacted IPRA and registered Mr. Godinez's death as an "Extraordinary Occurrence" on behalf of Lieutenant Jerome. (COPA Summary Report Dated October 24, 2017, Ex. 49 at 4).

85. IPRA investigator Thomas Kalantzis and Supervising Investigator Elena Olvera responded to the scene at 2046 W. Pershing Road to initiate an independent investigation of this incident. (Ex. 49 at 13; Dep. of Thomas Kalantzis, Ex. 50, 36:5-15).

86. IPRA investigators gathered relevant physical and documentary evidence associated with this incident, including but not limited to statements from numerous individuals including all accused officers. (Ex. 49 at 13, 22-34, 36-47).

87. After a thorough review of the evidence and applicable law, COPA made the following allegations and findings with respect to misconduct against the involved police officers:

    a. Officer Todd Johnson - Use of improper and excessive force toward Mr. Godinez when he used his foot to restrain him was sustained, and failure to complete and submit a Tactical Response Report (TRR) to document the use of force was sustained;

    b. Officer James McAndrew - Failure to intervene to ensure the safety of Mr. Godinez was sustained, and failure to request medical attention for Mr. Godinez was sustained;

    c. Officer Rodrigo Corona - Use of improper and excessive force toward Mr. Godinez when he used his foot to restrain him was sustained, and failure to request medical assistance for Mr. Godinez was sustained;

    d. 4) Officer Brian Madsen - Failure to intervene and ensure the safety of Mr. Godinez when he observed Officer Todd Johnson use his foot to restrain Mr. Godinez was not sustained;

    e. 5) Officer Gerald Nowakowski - Failure to intervene and ensure the safety of Mr. Godinez when he observed Officer Todd Johnson use improper and excessive force toward Mr. Godinez was unfounded, and failure to request medical attention for Mr. Godinez was unfounded; and,

    f. 6) Lieutenant Don Jerome - Failure to intervene when he observed Officer Todd Johnson use improper and excessive force toward Mr. Godinez was unfounded, and failure to request medical attention for Mr. Godinez was sustained.

(Ex. 49 at 68-69).

88. Chicago Police Department Superintendent of Police Eddie T. Johnson conducted a review of COPA's allegations and findings against the accused officers, and he concurred with some of the sustained findings, disagreed with others, and proposed penalty recommendations in the form of a non-concurrence. (Superintendent of Police Eddie Johnson's Non-Concurrence Letter to COPA Dated January 23, 2018, Ex. 51).

89. On February 6, 2018, the Police Department and COPA discussed the non-occurrence and agreed to penalty recommendations for the involved officers as follows: Officer Todd Johnson - 21 day suspension with no options; Officer Rodrigo Corona – 10 day suspension with no options; Officer James McAndrew – 5 day suspension with no options; and Capt. Don Jerome – 2 day suspension with no options. (Superintendent of Police Eddie Johnson's Penalty Recommendations Letter Dated February 14, 2018, Ex. 52).

I.  **City's Training On The Use Of Force And Defendant Officers Awareness To Curb Police Misconduct**

90. Officers McAndrew, Lindskog, Corona, Johnson, Madsen, Nowakowski, Brown and Calderon each made physical contact with Godinez on the night of the incident when attempting to restrain Godinez, handcuff and flex cuff Godinez, and/or carry him to the wagon. (McAndrew, Ex. 3, 198:11-199:1, 213:21-214:6, 214:18-216:24, 217:15-218:8; Lindskog, Ex. 4, 170:21-171:8, 171:12-14; Corona, Ex. 6, 231:4-7, 233:10-18, 234:9-13, 234:22-235:13; Johnson, Ex. 11, 241:2-17, 242:2-8; Madsen, Ex. 12, 202:8-16; Nowakowski, Ex. 13, 157:8-20; Calderon, Ex. 17, 158:8-159:5).

91. Officers McAndrew, Lindskog, Corona, Madsen, Johnson, Brown and Calderon were trained by the Chicago Police Department regarding proper restraint techniques and the use of force model. (McAndrew, Ex. 3, 107:11-20, 120:5-9; Lindskog, Ex. 4, 68:16-19, 73:8-10; Corona, Ex. 6, 33:17-22, 143:19-144:2; Johnson, Ex. 11, 57:22-58:1, 63:17-20, 74:18-21, 84:7-12; Madsen, Ex. 12, 122:12-16; Calderon, Ex. 17, 141:11-17; Brown, Ex. 18, 107:1-6).

92. Officers McAndrew, Lindskog, and Calderon were trained by the Chicago Police Department regarding handcuffing and leg shackles. (McAndrew, Ex. 3, 124:11-22; Lindskog, Ex. 4, 66:3-9; Calderon, Ex. 17, 141:11-17, 145:5-10).

93. Officers McAndrew, Lindskog, Corona, Madsen, Johnson and Arroyo were trained by the Chicago Police Department regarding the prevention of restricting a subject's ability to breathe while restraining that subject. (McAndrew, Ex. 3, 129:5-11, 135:17-22, 136:20-137:2; Lindskog, Ex. 4, 80:5-81:12; Corona, Ex. 6, 159:18-160:2; Arroyo, Ex. 7, 102:18-21; Johnson, Ex. 11, 78:13-79:5, 105:4-9; Madsen, Ex. 12, 121:5-10, 123:4-7, 123:18-124:2).

94. Officers McAndrew, Johnson, and Corona were aware that they would be investigated and disciplined for any misconduct. (Ex. 3, 80:18-81:8; Ex. 6, 62:12-21; Ex. 11, 312:15-23).

95. Lieutenant Jerome "took great pains to monitor Mr. Godinez, including worrying about…positional asphyxia. . . and other important things like, making sure he wasn't on his front side too long so he could breathe correctly, making sure he didn't hit his head throughout this whole incident and monitoring him." (Ex. 15, 99:2-100:1, 103:2-7).

**J.   Dash Camera Evidence**

96. Sergeant Scott Stapleton is the supervising sergeant of the Chicago Police Department's in-car camera section of the information services division. (Dep. of Sergeant Scott Stapleton, Ex. 53, 5:10-17). Police dash cameras in the City of Chicago during July 2015 often were recording in fail-safe mode once a police officer logged into the car's computer system, which allowed one of the City's approximately 20 technicians to manually go into a dash camera's computer system within 24 to 48 hours and retrieve video footage, even if the dash camera was not specifically activated for an event. (Ex. 53, 19:13-20:22, 68:1-10). This fail-safe function allowed technicians to retrieve the Video in this case. (Ex. 53, 38:19-39:19).

97. Police officers do not have access to the fail-safe video. (Ex. 53, 20:12-18).

Respectfully submitted,

/s/ Avi T. Kamionski

Avi T. Kamionski Atty. #6283191

Avi Kamionski
Shneur Nathan
Robin Shoffner
Christopher Wallace
Natalie Adeeyo
Nathan & Kamionski LLP
33 West Monroe, Suite 1830
Chicago, IL 60603
(312) 612-1928

## CERTIFICATE OF SERVICE

I, Avi T. Kamionski, an attorney, hereby certify that I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which sent electronic notification of the filing on the same day to all counsel of record.

*/s/ Avi T. Kamionski*
Avi T. Kamionski