UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JANET GODINEZ, on behalf of herself and as administrator of the estate of her brother, HERIBERTO GODINEZ, Deceased,<br><br>Plaintiff,<br><br>v.<br><br>THE CITY OF CHICAGO, ET AL.,<br><br>Defendants. | No. 16 CV 7344<br><br>District Judge Mary Rowland |

## MEMORANDUM OPINION AND ORDER

Plaintiff Janet Godinez brings this excessive force and wrongful death action on behalf of her brother, Heriberto Godinez, against Defendant the City of Chicago ("the City") and Defendant Officers. Before the Court is the City's motion to bar the testimony of Plaintiff's retained expert, Dr. Michael Baden [Dkt. 277]. For the reasons set forth below, the motion is **DENIED**.

## LEGAL STANDARD

Under *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), the requirements of Federal Rule of Evidence 702 must be met before an expert can testify. "In performing its gatekeeper role under Rule 702 and *Daubert*, the district court must engage in a three-step analysis before admitting expert testimony. It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable;

and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (internal citations and quotations omitted). District courts have "significant discretion under the flexible *Daubert* inquiry." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 818 (7th Cir. 2012). The burden is on the party seeking to admit the expert to show by a preponderance of the evidence that the expert meets the requirements of Rule 702 and *Daubert. Gopalratnam,* 877 F.3d at 782.[1]

As the Seventh Circuit has explained:

> (t)he purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony to determine if it has 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field' so as to be deemed reliable enough to present to a jury. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy. If the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury. *Lapsley*, 689 F.3d at 805.

Because "there are many different kinds of experts, and many different kinds of expertise, . . .the gatekeeping inquiry must be 'tied to the facts' of a particular case." *Kumho Tire Co.*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 591). Courts therefore review each conclusion of the expert in relation to the expert's education, skill, and training, and ask "not whether an expert witness is qualified in general, but whether

---

[1] Under Rule 702, "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

his qualifications provide a foundation for [him or her] to answer a specific question." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (internal citations and quotations omitted). With regard to reliability, "the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion." *C.W. v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015) (internal citations and quotations omitted).

## **DISCUSSION**

Plaintiff retained forensic pathologist Michael Baden, M.D., to "assist the jury in understanding the critical cause of death issue." (Dkt. 338 at 2). Dr. Baden is the former Chief Medical Examiner of New York City and the former Chief Forensic Pathologist of the New York State Police. He has performed over 20,000 autopsies in his forty-five years as a medical examiner and has authored or co-authored more than 80 professional articles and books on forensic medicine. He has served as President of the Society of Medical Jurisprudence and Vice President of the American Academy of Forensic Science and has been a consultant to the Federal Bureau of Investigation, Veteran's Administration, Bureau of Alcohol, Tobacco and Firearms, Drug Enforcement Agency and the United States' Department of Justice. He also has testified at over 60 trials and depositions. (*See* Dkt. 338-1 at 1–32).

After reviewing the Medical Examiner's file, including an autopsy report, toxicology and neuropathology reports, autopsy x-rays, microscopic slides, scene and autopsy photographs, scene videos, microscopic slides as well as expert reports, depositions, and police and witness statements, Dr. Baden offered the following opinions:

> Opinion 1: Mr. Godinez did not die from cocaine and alcohol toxicity.
>
> Opinion 2: Mr. Godinez' autopsy revealed evidence of asphyxia.
>
> Opinion 3: Mr. Godinez died as a result of the restraint techniques used on him by police. (Dkt. 338-4 at 1–8)

Defendants do not challenge Dr. Baden's overall qualifications but focus their arguments on the reliability of his opinions in his report and testimony. Defendants take issue with Dr. Baden's "ultimate" cause of death opinion that "Mr. Godinez's death was due to asphyxia–an inability to breathe–caused by the way in which he was restrained by police before and when he was placed in the van." (Dkt. 277, citing Dkt. 277-1 at 8). Defendants argue that Dr. Baden's cause of death opinion and testimony should be barred because it: 1) "fails to reliably exclude cocaine as the cause of death"; and 2) "is so speculative that it is inherently unreliable." (Dkt. 277 at 3).

This Court concludes that Dr. Baden's methodology is sound and Defendants objections go to the weight of his conclusions, not their admissibility. The Supreme Court in *Daubert* emphasized that the court's gate keeping inquiry "must be solely on principles and methodology, not on the conclusion that they generate." *Daubert*, 509 U.S. at 595. Dr. Baden indicated that he incorporated the usual methods used by forensic pathologists, making his diagnosis and conclusions "on the basis of the circumstances of the death, the basis of the autopsy findings, the basis of the toxicology findings, [and the] basis of the X-rays." (Dkt. 338-2 at 245–46). Although he did not explicitly state his methodology beyond this, Dr. Baden appears to have engaged in "differential etiology," a methodology for determining causation where "an expert must systematically 'rule in' and 'rule out' potential causes in arriving at her ultimate

conclusion" in a scientifically valid manner. *Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015). The Court finds that, contrary to Defendants' assertions, Dr. Baden "adequately accounted for obvious alternative explanations." *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 434 (7th Cir. 2013).

**Opinion 1: Mr. Godinez did not die from cocaine and alcohol toxicity.**

In his report, Dr. Baden ruled out cocaine and ethanol toxicity as a cause of death because: 1) toxicology showed Mr. Godinez's blood alcohol level was .055% at death, which is less than the DWI level of 0.08%; 2) his blood cocaine level when he died was 1400 nanograms (ng)/milliliters (ml), "which is significantly lower than the average lethal level of 4600 ng/ml as explained in [National Medical Service's] (NMS) toxicology report attached to Mr. Godinez's autopsy" and lower than the average of 5,300 ng/ml cited in *Baselt: Disposition of Toxic Drugs and Chemicals in Man,* 11th Ed. (2017) (*Baselt*); and 3) "cocaine and alcohol taken more than 30 minutes earlier would not cause a sudden rapid death in a conscious, moving person as occurred with Mr. Godinez." (Dkt. 338-1 at 5–6).

Defendants argue that Dr. Baden's conclusions are not scientifically valid because the two studies Dr. Baden cites place Mr. Godinez's blood cocaine level of 1400 ng/ ml "comfortably within the lethal range." (Dkt. 277 at 6). Dr. Baden acknowledged at his deposition that Mr. Godinez's blood cocaine level of 1,400 ng/ml was within the NMS lab range of 40 to 31,000 ng/ml for lethal levels and within the *Baselt* range of 900 to 21,000 ng/ml for lethal levels. (Dkt. 338-2 at 93–94, 99–100). But Dr. Baden also testified that Mr. Godinez's blood cocaine level was significantly below the average lethal

blood concentration level in these studies, where the average was 4,600 ng/ml in the NMS lab study and 5,300 ng/ml in *Baslet*. (*Id.* at 105–07). Further, he explained that "the NMS range does not distinguish those people who died at the scene and those people who died days later"; nor does it distinguish "the number of people who had other drugs in their body in addition to cocaine which were perhaps more significant in the cause of death." (Dkt. 338-2 at 198). He also testified that the number alone does not indicate that an amount is *per se* lethal, stating, "[t]here's no threshold amount . . . a lot depends on how [ ] tolerant a person becomes to a drug." (Dkt. 338-2 at 120, 123).

Dr. Baden also ruled out death from cocaine and alcohol toxicity finding that Mr. Godinez's physical activity, as caught on video, is not consistent with a person suffering a cocaine overdose. He testified that based on his experience and review of the literature, "most deaths from cocaine overdose cause a loss of consciousness within minutes of taking the drug." (Dkt. 338-2 at 115). Mr. Godinez would either "die right away or lose consciousness right away, but he would not suddenly collapse and die from the cocaine taken 30 minutes, or more, earlier especially because it's now a lot less [potent] than it was at that time [it was ingested]." (*Id.* at 113). He explained that "most cocaine deaths occur pretty early on after taking the drug" because of the rapid rate cocaine is metabolized "into chemicals that are not physiologically active as cocaine is." (*Id.* at 101–02). He stated that after 30 minutes, "any cocaine that [Godinez] would have taken earlier than that would have been greatly metabolized by that point and would have been much less than what would have caused an

overdose." (*Id.* at 102). Dr. Baden concluded that Mr. Godinez's "cocaine/alcohol levels were sufficient to cause his strange behavior but not his death;" and that they were at "recreational levels," which he defined in his deposition as non-lethal levels. (Dkt. 338-2 at 122–22) ("Recreational levels are levels that don't kill you."). Defendants fault Dr. Baden for not explaining "what specific experience he is relying on" to reach his conclusions. (Dkt. 378 at 4–5). Dr. Baden stated that he has conducted over 20,000 autopsies and has worked on thousands of cases where he determined that cocaine or ethanal toxicity was the cause of death, and he has "reviewed hundreds of cases where cocaine was a factor as here." (Dkt. 338-2 at 8, 17, 27).

The Court finds that Dr. Baden gave reasoned explanations of how his experience, his interpretation of the data, Medical Examiner's files, video evidence and literature lead to his conclusions. This is not a case where the expert was "[t]alking off the cuff—deploying neither data nor analysis." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000). Nor is this a case where the expert is "relying soley or primarily on experience" and failing to explain "how that experience leads to the conclusion reached." *The Advisory Committee Note to the 2000 Amendments to Rule 702*. This case is distinguishable from *Rascon* where an Arizona district court excluded Dr. Baden's medical testimony "because he [did] not include any reference to peer reviewed publications or any objective evidence to support his conclusions." *Rascon v. Brookins*, No. CV-14-00749-PHX-JJT, 2018 WL 739696, at *6 (D. Ariz. Feb. 7, 2018). Here, as noted above, Dr. Baden referenced peer reviewed publications and explained the objective evidence that supported his conclusions. Any challenges to Dr. Baden's

conclusions and methodology can be addressed through "rigorous cross-examination at trial if (the party) so chooses." *Medicines Co. v. Mylan Inc.*, No. 11-CV-1285, 2014 WL 1257957, at *4 (N.D. Ill. Mar. 27, 2014).

**Opinion 2: Mr. Godinez' autopsy revealed evidence of asphyxia.**

Defendants argue that Dr. Baden's finding that Mr. Godinez died of asphyxia is scientifically invalid because it is not supported by the autopsy findings. Dr. Baden's opinion is based on a number of specific findings from his review of the medical examiner's file, the autopsy report and witness statements. For instance, he stated in his report that "red brown abrasions on his neck, fresh hemorrhages adjacent to his carotid arteries bilaterally and the petechial hemorrhages in his eye are evidences of neck compression that interfered with blood flowing to his brain"; "bruises and contusions on his chest, abdomen and back are evidences of interference with breathing caused by pressure on his thorax that prevents the lungs from inhaling and exhaling air"; and witness statements indicated that Mr. Godinez struggled to breathe during this incident. (Dkt. 338-4 at 5–7). He also cited the autopsy report's notation of "acute, global hypoxic/ischemic injury . . . caused by a lack of oxygen to the brain" to support his conclusions. (*Id.*). Dr. Baden elaborated in his deposition that the neuropathology report indicated "access mobility of the neck which would suggest that there was some injury to the spine, . . . there's some red neurons, there's some edema, there's evidence of global hypoxic encephalopathy which indicates lack of oxygen going to the brain, which is my opinion that cause of

death was inability to breathe causing lack of oxygen going to the brain that caused global hypoxia." (Dkt. 338-2 at 37–38).

Defendants dispute Dr. Baden's opinions and argue that (1) Godinez had only superficial abrasions on his body and those were not necessarily caused by police officers in light of Godinez's behavior; (2) Dr. Mao found that 90% of all deaths involve "acute, global hypoxic/ischemic injury"; and (3) Dr. Denton supports the finding that the hemorrhaging of the carotid arteries was caused by other causes. (Dkt. 227 at 7–9). The Defendants' experts disagree with Dr. Baden's interpretation of the data, but that goes to the weight of Dr. Baden's opinions, not their admissibility. *Stollings v. Ryobi Techs., Inc.,* 725 F.3d 753, 765 (7th Cir. 2013) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.") (*quoting Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)). *Walker v. Soo Line R. Co.*, 208 F.3d 581, 589 (7th Cir. 2000) ("That two different experts reach opposing conclusions from the same information does not render their opinions inadmissible."). This battle between the experts is not a basis for the court to exclude Dr. Baden.

### Opinion 3: Mr. Godinez died as a result of the restraint techniques used on him by police.

Dr. Baden opined that Mr. Godinez "suffered a period of oxygen deprivation to his brain" when police officers "us[ed] their feet, knees, and hands to put pressure on Mr. Godinez's body when he was lying prone on the ground and handcuffed behind his back." (Dkt. 338-4 at 7). These techniques "interfered with his ability to

breathe and caused his asphyxia death." (Dkt. 338-4 at 7). As evidence of trauma and injury to the neck caused by "Officer Johnson put[ting] significant pressure on Mr. Godinez's neck area with his foot," Dr. Baden cited to the Medical Examiner's notation of "hemorrhages in the tissue around his carotid arteries," and Dr. Leestma's observation of "edema and hemorrhages in the spinal cord near the C2-C4 vertebrae." (Dkt. 338-4 at 7). He opined that "the edema, hemorrhaging and damage to the upper spinal cord level in the neck would also cause an inability to breath." (Dkt. 338-4 at 7–8). He concluded that Mr. Godinez's death was due to asphyxia "caused by the way in which he was retrained by police before and when he was placed in the van; and that the manner of his death was homicide because it was caused by the hands of another." (Dkt. 388-4 at 8).

In his deposition, Dr. Baden testified that the officer's restraining techniques as seen on the video interfered with Mr. Godinez's breathing to the point that he was "unconscious for about five minutes." (Dkt. 338-2 at 80). He elaborated, "[b]ut then as often happens in people who lose consciousness, the breathing become a little better and the oxygen level goes up a little bit in his blood and he regains consciousness, but he still has less oxygen level in him than a normal person." (Dkt. 338-2 at 80–81). He stated he does not know what happened off camera to "further depress his breathing" to "cause permanent unconsciousness." (Dkt. 338-2 at 81). But he stated:

> [W]hat I do know is he died because his brain didn't get enough oxygen as the pathologist, the neuropathologist say, so that somehow something happened to him that he had hypoxic encephalopathy and whether it was somebody sitting on him in the van or pressing down

> with his hands in the van or – or compressing his neck while he was being taken into the van because there is hemorrhage around the carotid arteries and there are petechial hemorrhage in the eye, which indicates that there was at some point some neck compression, I don't know. But what I'm saying is the only cause of death I can find is that the lack of oxygen going to the brain causes death due to asphyxia. (Dkt. 338-2 at 131–132).

Defendants argue that "Dr. Baden's opinion that 'something' must have happened after the video by 'someone' that interfered with Godinez's ability to breath and cause death" is rank speculation. (Dkt. 378 at 3). The Court disagrees. "*Daubert* analysis does not preclude testimony merely because it may be based upon an assumption." *Sachs v. Reef Aquaria Design, Inc.*, No. 06 C 1119, 2007 WL 3223336, at *5 (N.D. Ill. Oct. 25, 2007) (citing *In re TMI Litigation,* 193 F.3d 613, 677 (3d Cir.1999)). As long as the supporting assumption is "sufficiently grounded in sound methodology and reasoning to allow the conclusion it supports," the testimony should be allowed. *Id.* In *Sachs*, a central issue in a breach of contract, breach of express warranty and negligence action was what caused the glass of an aquarium to crack. Plaintiff sought to bar expert testimony that "something happened"— either "someone jumped into the tank or jumped off the last rung of the ladder while inside the aquarium or dropped a rock inside the tank" — causing the damage to the aquarium because Defendants offered no physical proof that some unknown event occurred. *Id.* The court found that the expert's opinion was not "mere speculation," because it was "based on sufficient factual data" such as "calculations of the force required to break the glass and likely activities powerful enough to exert that force." *Id.* The court concluded that "[a]lthough Plaintiff and his experts might disagree

with Mr. Allen's theory that D&D did something while in the tank to cause it to crack, this is a factual determination that only the trier of fact may decide." *Id.*

Likewise, here, the Court finds that Dr. Baden's supporting assumption that "something happened" while Mr. Godinez was in the police van that further depleted his oxygen level and caused his death is "sufficiently grounded in sound methodology and reasoning." Rather than rank speculation, Dr. Baden explained that Mr. Godinez's physical findings are not consistent with sudden death from cocaine or alcohol toxicity but are consistent with interference with Mr. Godinez's ability to breathe both during the events captured on video and afterwards when he was carried off camera. (Dkt. 338-2 at 33). Although he was unable to know what event occurred while Mr. Godinez was taken off camera, he cited evidence in addition to the evidence from autopsy that Mr. Godinez struggled to breathe after he was off camera:

> Mayela Ramirez stated that she was in her apartment at a window about 20 feet from the police at the time of the incident and saw the police carry Mr. Godinez "to a van or squadrol" and heard him shout "I can't breathe." Officer Corona stated that Mr. Godinez's breathing was labored. Lt. Jerome stated that when the police officers put Mr. Godinez in the wagon, he looked like he might have been having trouble breathing and that his breathing was labored. (Dkt. 338-4 at 6).

Dr. Baden made his conclusions based on this testimony combined with the physical findings and his years of experience. These are accepted methods of forensic pathologists, and the Court finds that Dr. Baden properly "utilize[d] the methods of the relevant discipline." *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 805–10 (7th Cir. 2013). "The question of whether the expert is credible or whether

his or her theories are correct given the circumstances of a particular case is a factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based." *Smith* 215 F.3d at 718–19; *see also Stollings*, 725 F.3d at 765–67 ("An expert may provide expert testimony based on a valid and properly applied methodology and still offer a conclusion that is subject to doubt. It is the role of the jury to weigh these sources of doubt.").

The Court finds that Dr. Baden is qualified to give the opinions from his Report, that his methodology is sound, and that his testimony will be helpful to the jury. *See Smith*, 215 F.3d at 718–19 ("Where an expert's hypothetical explanation of the possible or probably causes of an event would aid the jury in its deliberations, that testimony satisfies Daubert's relevancy requirements."). Defendants are free to test Dr. Baden's conclusions and methodology on cross- examination at trial. *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

## **CONCLUSION**

For the reasons discussed, the City's motion to bar the testimony of Plaintiff's retained expert, Dr. Michael Baden [Dkt. 277] is **DENIED**.

E N T E R:

Dated: October 18, 2019

_____
MARY M. ROWLAND
United States District Judge