# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| **JANET GODINEZ, on behalf of herself and as administrator of the estate of her brother, HERIBERTO GODINEZ, Deceased,**<br><br>Plaintiff,<br><br>v.<br><br>**THE CITY OF CHICAGO, ET AL.,**<br><br>Defendants. | No. 16 CV 7344<br><br>**District Judge Mary Rowland** |

## MEMORANDUM OPINION AND ORDER

Plaintiff Janet Godinez brings this excessive force and wrongful death action on behalf of her brother, Heriberto Godinez, against Defendant the City of Chicago ("the City") and Defendant Officers. Before the Court is the City's motion to bar the testimony of Plaintiff's retained expert, Dr. Jan Leestma [Dkt. 275]. For the reasons set forth below, the motion is **DENIED**.

## LEGAL STANDARD

Under *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993), the requirements of Federal Rule of Evidence 702 must be met before an expert can testify. "In performing its gatekeeper role under Rule 702 and *Daubert*, the district court must engage in a three-step analysis before admitting expert testimony. It must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable;

and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (internal citations and quotations omitted). District courts have "significant discretion under the flexible *Daubert* inquiry." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 818 (7th Cir. 2012). The burden is on the party seeking to admit the expert to show by a preponderance of the evidence that the expert meets the requirements of Rule 702 and *Daubert. Gopalratnam,* 877 F.3d at 782.[1]

As the Seventh Circuit has explained:

> (t)he purpose of the *Daubert* inquiry is to scrutinize proposed expert witness testimony to determine if it has 'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field' so as to be deemed reliable enough to present to a jury. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999). A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy. If the proposed expert testimony meets the *Daubert* threshold of relevance and reliability, the accuracy of the actual evidence is to be tested before the jury. *Lapsley*, 689 F.3d at 805.

Because "there are many different kinds of experts, and many different kinds of expertise, . . . the gatekeeping inquiry must be 'tied to the facts' of a particular case." *Kumho Tire Co.*, 526 U.S. at 150 (quoting *Daubert*, 509 U.S. at 591). Courts therefore review each conclusion of the expert in relation to the expert's education, skill, and training, and ask "not whether an expert witness is qualified in general, but whether

---

[1] Under Rule 702, "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

his qualifications provide a foundation for [him or her] to answer a specific question." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010) (internal citations and quotations omitted). With regard to reliability, "the key to the gate is not the ultimate correctness of the expert's conclusions. Instead, it is the soundness and care with which the expert arrived at her opinion." *C.W. v. Textron, Inc.*, 807 F.3d 827, 834 (7th Cir. 2015) (internal citations and quotations omitted).

## DISCUSSION

### A. Background

Plaintiff retained forensic neuropathologist Jan Leestma, M.D., to offer a cause of death opinion. (Dkt. 339 at 2). Dr. Leestma has practiced forensic neuropathology and medicine for over 40 years. He has served as the Assistant Medical Examiner in neuropathology at the Office of the Cook County Medical Examiner, the Director of Neuropathology at Northwestern University Medical Center, Chief of Neuropathology at Children's Memorial Hospital, Executive Director of Research of the Chicago Institute of Neurosurgery and Neuroresearch. He has performed over 20,000 brain autopsies and 8,000 spinal cord dissections, has testified at over 100 trials and depositions, and has authored or co-authored 116 books and articles on forensic medicine and neuropathology. (*See* Dkt. 339-8 at 1–8; Dkt. 339-8 at 22–26, 190–91).

After reviewing the medical examiner's file, including radiology, x-rays, and toxicology and neuropathology consults; the investigation file, including police officer and witness statements; brain and spinal cord slides, Drs. Watkins' and Denton's reports; a police dash cam video ("video"), and personally observing the brain and spinal cord cutting and examination, Dr. Leestma offered the following opinions in this matter:

> Opinion 1: Before his death, Mr. Godinez's brain was deprived of blood flow and/or oxygen intermittently or all at once causing him to suffer hypoxia-ischemic brain injury.
>
> Opinion 2: Mr. Godinez suffered trauma to the neck that made his neck hypermobile and probably unstable which made him vulnerable to a spinal cord injury during transport.
>
> Opinion 3: Mr. Godinez suffered a spinal cord injury in the region of the C2-C4 vertebrae, which ultimately paralyzed him from the neck down and caused him to suffocate. (Dkt. 339-6 at 1–4).

In his report, Dr. Leestma explains that it appears that two significant events occurred in this case: "First, Mr. Godinez's neck and cervical spine suffered trauma and his already destabilized cervical spine was not immobilized. Second, Mr. Godinez's neck suffered further movement or trauma after the initial destabilization, which injured his spinal cord." (Dkt. 339-6 at 4). Dr. Leestma based these findings on observations from histology slide #11 of edema and small hemorrhages in Mr. Godinez's spinal cord near the C2-C4 vertebrae, which indicated "the early stages of a spinal cord injury causing phrenic nerve paralysis and loss of diaphragmatic function." (*Id.*). He explained that such an injury "does not always include fractures that can be viewed on an x-ray, or even damage to the neck ligaments that can be observed during a visual examination;" and that this condition is known as SCIWORA (spinal cord injury without radiological abnormality). (*Id.*). He stated that this spinal cord injury "would have paralyzed Mr. Godinez below his neck" and "would have made it difficult or impossible for Mr. Godinez to accomplish normal breathing, but it might have permitted him to accomplish some high neck breathing from preserved

innervation to the neck strap muscles." (*Id.*). He concluded that Mr. Godinez's brain would not have had enough oxygen and "ultimately he died from respiratory failure." (*Id.*).

Defendants argue that Dr. Leestma's cause of death opinion "depends on multiple assumptions which are unsupported by science or the record and are chained together to arrive at a wildly unreliable opinion." (Dkt. 275 at 2). Defendants state that Dr. Leestma's opinions must be barred "[b]ecause of lack of qualifications, the failure to apply reliable methods, and the choice to resort to speculation in the absence of evidence." (*Id.* at 7).

## B. Dr. Leestma is Qualified to Offer Opinions on the Cause of Death

In light of Dr. Leestma's qualifications listed above, there is no basis to challenge him as unqualified to offer a cause of death opinion. Defendants do not attack Dr. Leestma's qualifications directly but cite to two cases where some or all of Dr. Leestma's testimony was barred.[2] The Court finds these cases inapposite. In *Kane,* the plaintiff claimed that he developed a brain tumor as a result of being exposed to an unsafe level of radio frequency (RF) while employed at Motorola. *Kane v. Motorola,*

---

[2] Defendants also cite a "shaken baby" case, *Commonwealth v. Woodward*, where Dr. Leestma testified for the defense that the victim's death was due to a "re-bleed" from a preexisting skull fracture not from abuse by an au pair, Louise Woodward. *Com. v. Woodward*, 427 Mass. 659, 671, 694 N.E.2d 1277, 1287 (1998). The court admitted the testimony of Dr. Leestma. After the trial, 72 medical professionals wrote an article for *Pediatrics* indicating that Dr. Leestma's opinion was "inaccurate, contrary to vast clinical experience, and unsupported by any published literature." (Dkt. 275 at 4). Defendants asked Dr. Leestma about this at deposition and he stood by his opinion in that case. (Dkt. 275-2 at 194–96). This Court does not believe the *Woodward* matter supports disqualifying Dr. Leestma as that court admitted his testimony into evidence, and that matter is nearly 20 years old and Dr. Leetsma has been found qualified to testify scores of times in the interim.

*Inc.*, 335 Ill. App. 3d 214, 223, 779 N.E.2d 302, 310 (2002), *as modified on denial of reh'g* (Nov. 27, 2002). The Illinois Supreme Court affirmed the circuit court's decision to bar Dr. Leestma's testimony because "Dr. Leestma admitted there was no scientific data to support his opinion." *Id.* at 310. The court noted that Dr. Leestma acknowledged in his deposition that: 1) "the scientific data did not support [his] conclusion[ ] that Kane suffered an RF burn, which led to his development of a brain tumor"; 2) he "knew of no studies indicating an RF burn was capable of causing a brain tumor"; 3) he was "unable to state how [he] extrapolated [his] conclusion[ ] from the scientific data upon which [he] relied or how the numerous dissimilar studies [he] cited to supported [his] conclusions"; and 4) he did not conduct "any independent tests or investigation to determine whether the prototype or an antenna similar to the prototype was capable of causing an RF burn." *Id.* Unlike in *Kane*, where Dr. Leestma "admitted there was no objective evidence that Kane sustained a burn injury based on his examination of the tissue samples of Kane's tumor," *id.* at 306, here, Dr. Leestma identified evidence of trauma to Mr. Godinez's neck and cervical spinal cord from a histology slide and autopsy reports. (Dkt. 339-6 at 3). In addition, he observed a video of the basis of the initial neck injury, observed the initial brain and spinal cord dissection and examination, and he relied on peer reviewed literature on SCIWORA (spinal cord injury without radiological abnormality) contained in the textbook *Forensic Neuropathology* that he authored. (Dkt. 339-3 at 9–12).

In *State v. Pingle*, a manslaughter case from the State of Washington involving the traumatic head injury of a three-month old child, the appellate court affirmed the

trial court's ruling that "Dr. Leestma could testify to all the issues related to the brain, the dura, the spine . . . but could not testify to his findings as to the heart and lungs because those findings were new, speculative, and not helpful to the jury." *State v. Pingle*, 158 Wash. App. 1011, 2010 WL 4056177, *4 (Wash. Ct. App. 2010). The *Pingle* court found Dr. Leestma's heart and lung findings were "peripheral" to his ultimate cause of death opinion, and Dr. Leestma could not explain how these findings related to his conclusion that the child died of chronic subdural hematoma.[3] *Id.* What is significant for this Court is that the core of Dr. Leestma's opinion relating to the central cause of death was admissible; Dr. Leestma explained those core findings based on his observations of the data and his expertise; and, when he made an observation that was peripheral to his findings and that he could not explain, he admitted that fact.

There is nothing in the cases cited by Defendants that gives the court pause regarding Dr. Leestma's qualifications to testify as to cause of death generally.

---

[3] For instance, when asked about the significance of inflammatory deposits in the heart, he stated, "[i]t's just something that struck me as being abnormal and I'm not quite sure what it means." *Id.* When asked about macrophages in the lungs, Dr. Leestma stated it could indicate "some element of heart failure" or the child could have had a cold. The *Pingle* court excluded these opinions. *Id.*

## C. Dr. Leestma's Opinions are Admissible

**Opinion 1: Before his death, Mr. Godinez's brain was deprived of blood flow and/or oxygen causing him to suffer a hypoxia-ischemic brain injury.**

Dr. Leestma based this opinion on microscopic examination of the brain and spinal cord which revealed "the presence of 'red' stained neurons diffused throughout Mr. Godinez's brain." (Dkt. 275-2 at 4). Dr. Leestma explained "[t]he number and location of 'red neurons' in this case indicate Mr. Godinez's brain suffered at least one episode of hypoxia-ischemia. Mr. Godinez's brain was deprived of oxygen for a period of time while he was still alive, causing red neurons to form throughout his brain." (*Id.*). Defendants dispute this opinion and argue that (1) global hypoxic-ischemic injury is "not specific and can be the product of several variables"; 2) Drs. Watkins, Denton, and Mao all "state that this injury is seen in virtually every death;" and 3) Dr. Watkins attributed Mr. Godinez's global hypoxic/ischemic injury to "sustaining a heart attack during the process of dying from cocaine." (Dkt. 275 at 5). That Defendants' experts disagree with Dr. Leestma's interpretation of the data goes to the weight of Dr. Leestma's opinion, not its admissibility. *Stollings v. Ryobi Techs., Inc.,* 725 F.3d 753, 765 (7th Cir. 2013) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.") (*quoting Smith v. Ford Motor Co.,* 215 F.3d 713, 718 (7th Cir. 2000)). *Walker v. Soo Line R. Co.,* 208 F.3d 581, 589 (7th Cir. 2000) ("That two different experts reach opposing conclusions from the same

information does not render their opinions inadmissible."). A dispute between the experts is not a basis for the court to exclude Dr. Leestma's Opinion 1.

**Opinion 2: Mr. Godinez suffered trauma to the neck that made his neck hypermobile and probably unstable which made him vulnerable to a spinal cord injury during transport.**

Defendants argue that Dr. Leestma cannot reliably determine if Mr. Godinez's neck was in fact hypermobile because 1) Dr. Leestma did not have a specific specialty in diagnosing hypermobility of the neck, (Dkt. 275 at 6, citing 275-2, 166); and 2) his findings contradict the findings of other experts including Drs. Watkins, Denton, Mao and Bigio. (*Id.*). First, Defendants fault Dr. Leestma's qualifications because when asked if he had any specialty in evaluating what types of actions cause hypermobility in the neck, he stated, "to some degree. Those are biomechanical questions, and I do have some knowledge in that area." (Dkt. 275-2 at 166). Dr. Leestma has performed over 8,000 spinal cord dissections. The Court finds, based on this extensive experience, that he is qualified to opine on neck hypermobility.

Next Defendants argue that Dr. Leestma "presumably" relies on the Medical Examiner, Dr. Watkins' notation that "there was palpable laxity of the neck upon manual rotation," (Dkt. 275-4 at 2), but Dr. Watkin's interpretation of the significance of that finding is at odds with Dr. Leestma's interpretation. (Dkt. 275 at 10). Dr. Leestma did quote Dr. Watkin's notation of palpable laxity in the "Synopsis of the Case" section of his report, (dkt. 275-1 at 2), and he did testify that neck hypermobility "was reported by the autopsy pathologist." (Dkt. 275-2 at *164:5–9*). Defendants argue that because Dr. Leestma relies on the words "palpable laxity" from Dr.

Watkins' report, "he must accept the Medical Examiner's entire findings on this point." (Dkt. 377 at 8). The Court disagrees. Experts often reach different conclusions on the same data based on their experience, expertise and interpretation of the data. *Walker*, 208 F.3d at 589. This is also true for Defendants' criticism that Dr Leestma improperly "view[ed] hypermobility as an abnormal condition" when Drs. Watkins, Denton, Mao and Bigio did not. (Dkt. 275 at 7). The weight to give these expert conclusions is a matter for the jury to decide. *Gicla v. United States*, 572 F.3d 407, 414 (7th Cir. 2009) (noting that the case "presented a classic battle of the experts . . . [that] called upon the factfinder to determine what weight and credibility to give to each expert.").

Defendants argue that even if Mr. Godinez's neck was "hypermobile," Dr. Leestma cannot reliably determine whether this finding was caused by any police officer or whether this finding rendered Mr. Godinez more susceptible to further injury. (Dkt. 275 at 11). Defendants fault Dr. Leestma for stating there was "[n]o way for me to know" whether Mr. Godinez's neck was hypermobile prior to the police encounter; for describing "possible injury [ ] scenarios that might have resulted in [ ] the injuries to Mr. Godinez"; and for stating that Mr. Godinez's neck was "probably" unstable and "vulnerable to a spinal cord injury during transport." (Dkt. 377 at 8–9). But "[t]rained experts commonly extrapolate from existing data." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519, 139 L. Ed. 2d 508 (1997). Likewise, "an expert need not testify with complete certainty about the cause of an injury; rather

he may testify that one factor could have been a contributing factor to a given outcome." *Gayton*, 593 F.3d at 619.

The Court finds that there was not "too great an analytical gap between the data" and Dr. Leestma's second opinion. *Gen. Elec. Co.*, 522 U.S. at 146. Dr. Leestma explained that the hypermobility and evidence of bilateral hemorrhages in the tissues surrounding the carotid arteries located in the neck near the spinal column are evidence of trauma and "consistent with a grown man standing on Mr. Godinez's neck area with his full weight." (Dkt. 339-6 at 3). In his deposition, he described "two injury scenarios" from his viewing of the video that could have caused Mr. Godinez's neck to become hypermobile: 1) "the police officer had his foot and it looked like a fair bit of his weight on Mr. Godinez, who was in the prone position at that time with his head turned"; and 2) another officer "looked like he was kneeling on [ ] Godinez's upper back, lower neck in the video." (Dkt. 339-3 at 64). Dr. Leestma also testified that he observed Mr. Godinez's "head was lolling a bit" when he was being carried away from the vehicle as another possible indication that Mr. Godinez's neck became hypermobile. (*Id.* at 63). In his report, Dr. Leestma noted that with a destabilized neck, Mr. Godinez's spinal cord would be vulnerable to injury if the destabilized neck was moved further or suffered further trauma. (Dkt. 339-6 at 3). He noted "[t]his is why emergency responders are trained to immobilize a person in a cervical collar and a backboard before moving them." (*Id.*). Rather than "rank speculation," the Court finds that Dr. Leestma adequately explained his reasoning based on his training, experience, and interpretation of the data. Dr. Leestma may extrapolate from the multiple

sources of evidence he reviewed to determine whether the police actions seen on the video are consistent with the physical evidence of injury. The Court finds that Dr. Leestma's testimony "could assist the trier of fact even if he cannot say with complete certainty" whether the police officer's actions caused the injury. *Walker,* 208 F.3d at 587. The Court will allow Dr. Leestma to testify as to Opinion 2; Defendants can address the credibility and accuracy of this opinion on cross-examination. *Cooper v. Carl A. Nelson & Co.,* 211 F.3d 1008, 1021 (7th Cir. 2000), *as amended on denial of reh'g and reh'g en banc* (June 1, 2000) ("The proper method of attacking evidence that is admissible but subject to doubt is to cross-examine vigorously, to present contrary evidence, and to give careful instructions on the burden of proof.").

**Opinion 3: Mr. Godinez suffered a spinal cord injury in the region of the C2-C4 vertebrae, which ultimately paralyzed him from the neck down and caused him to suffocate.**

Defendants argue that Dr. Leestma's third opinion is not reliable because: 1) "Dr. Leestma's conclusion regarding cervical spinal injury in slide 11 is **factually impossible** since . . . there is no cervical spinal tissue in slide 11"; 2) he cannot reliably infer a spinal cord injury from viewing histology slide 11 without excluding an infarct associated with cocaine; 3) he cannot reliably diagnose SCIWORA postmortem; 4) he has no scientific basis to conclude that Mr. Godinez "sustained a severe phrenic nerve injury that would cause diaphragmatic paralysis and a complete inability to breathe;" 5) he improperly speculates how long a person would live after diaphragm paralysis and does not account for witness statements that Mr. Godinez was moving very shortly before his death; and 6) he does not rule out excited delirium as

a cause of death. (Dkt. 275 at 13–21) (emphasis in original). The Court will address each of these arguments in turn.

First, Defendants argue that Dr. Leestma improperly based Opinion 3 on "an alleged viewing of a histology slide cut from a portion of the cervical spine that did not actually exist." (Dkt. 275 at 4). Defendants rely on Dr. Mao's testimony that she did not create any tissue block from the cervical spine. (Dkt. 275 at 10–11) (*citing* Dkt. 275-6 at *76:5–8*). Plaintiff counters that the testimony of Dr. Mao is contradicted by the Medical Examiner's report that indicates "the brain and cervical spine were fixed and retained for neuropathological consultation." (Dkt. 339 at 2) (*citing* Dkt. 339-1 at 5). Plaintiff also points to Dr. Mao's testimony that she "has no independent recollection of conducting her exam and review of Godinez's brain and spinal cord." (Dkt. 339 at 2) (*citing* Dkt. 339-5 at 4); whereas Dr. Leestma recalls his examination of Mr. Godinez's brain and cervical spine, and took contemporaneous notes stating "[t]he entire spinal cord was present and the dura incised to reveal a dusky cord with possibly some softening and congestion in the cervical region." (Dkt. 339 at 16) (*citing* Dkt. 339-9 at 1). This is a factual dispute for the jury to resolve, not a basis to disqualify the expert. The Medical Examiner's report indicates "[t]he brain and cervical spinal cord were fixed and retained for neuropathological consultation;" (dkt. 339-1 at 5), and Dr. Leestma's notes from the initial brain and spinal cord dissection indicate that cuttings of the cervical spine were made. (Dkt. 339-9 at 1). On the contrary, Dr. Mao, reviewing photographs of the slides she prepared, testified that she did not prepare slides of the cervical spine. (Dkt. 377-4 at 22, 24). If the jury believes Dr. Mao,

Dr. Leestma's credibility will be severely damaged. But this factual dispute is not one this Court can resolve and not a basis to disqualify Dr. Leestma.[4] *Smith*, 215 F.3d at 718 ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or, where appropriate, on summary judgment."); *Lapsley*, 689 F.3d at 805 ("A *Daubert* inquiry is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy.").

Second, Defendants argue that even if histology slide #11 was taken from the cervical spine, Dr. Leestma's reliance on it is not a scientifically valid method to infer a spinal injury mainly because Dr. Leestma did not rule out an infarct associated with cocaine use. Defendants rely on deposition testimony where Dr. Leestma acknowledged that the edema and small hemorrhages observed in slide #11 could also be consistent with the early stages of an infarct in the spinal cord in the very acute phase. (Dkt. 275-2 at 59). But that is not an accurate description of the deposition passage. Dr. Leestma explained that *if he knew nothing about the case* and there was not video and he was given no information except "[w]e've got a microcirculatory problem, I don't know [if] it's an infarct, [ ]a spinal cord injury or some other process,"

---

[4] Defendants' arguments that Dr. Leestma (a) cannot be certain that histology slide #11 was from C2-C4, (Dkt. 275 at 10) (*citing* Dkt. 275-2 at 75–76), or (b) was unable to distinguish the lumbar spine from the cervical spine in an autopsy photograph, (Dkt. 275 at 11), are also matters for the jury. *Sachs v. Reef Aquaria Design, Inc.*, No. 06 C 1119, 2007 WL 3223336, at *2 (N.D. Ill. Oct. 25, 2007) ("The court must also keep in mind that the question of whether the expert is credible or whether the theories being applied by the expert are correct, is a 'factual one that is left for the jury to determine after opposing counsel has been provided the opportunity to cross-examine the expert regarding his conclusions and the facts on which they are based.'").

then he would not be able to tell from the histology slide alone whether or not this is the early stages of an infarct or an actual spinal cord injury. (Dkt. 275-2 at 60). But in this case Dr. Leestma did not base his opinion on a histology slide #11 alone, he reviewed the medical examiner's file, radiology, x-rays, toxicology and neuropathology consults; the investigation file, brain and spinal cord slides, the reports of Drs. Watkins and Denton; the police dash cam video and he personally observed the brain and spinal cord dissection and examination.

Defendants argue that Dr. Leestma's failure to rule out cocaine use as the reason for the microcirculatory problem he identified in slide #11 disqualifies him from reaching a cause of death opinion. When asked if he considered cocaine use being involved in the potential cause of death, Dr. Leestma testified that he considered it but was not qualified to make that determination; therefore, he recommended that Plaintiff consult with another expert, Dr. Baden. (Dkt. 275-2 at 44). "Medical professionals have long been expected to rely on the opinions of other medical professionals in forming their opinions." *Walker*, 208 F. 3d at 588. The Seventh Circuit has repeatedly held that "an expert need not testify with complete certainty about the cause of an injury; rather he may testify that one factor could have been a contributing factor to a given outcome." *Gayton*, 593 F.3d at 618–19; *see also Walker*, 208 F.3d at 589–90 ("Experts are allowed to posit alternate models to explain their conclusion . . . The jury would have been assisted by learning different ways that lightning could have penetrated the tower"). This matter can be addressed through cross-examination. *Cooper,* 211 F.3d at 1021 ("The possibility of Mr. Cooper's [chronic pain syndrome]

being attributable to a factor other than the fall is a subject quite susceptible to exploration on cross-examination by opposing counsel. Similarly, the accuracy and truthfulness of the underlying medical history is subject to meaningful exploration on cross-examination and ultimately to jury evaluation. Therefore, Nelson's contention that other conditions of Mr. Cooper's might have caused his CPS goes to the weight of the medical testimony, not its admissibility.").

Third, Defendants argue that there is no scientifically valid way to diagnose SCIWORA (spinal cord injury without radiological abnormality) postmortem. Defendants assert, "[n]o one denies that SCIWORA is a medical theory; however, nothing in Dr. Leestma's textbook (or anything mentioned at his deposition) demonstrates that he is qualified to diagnose SCIWORA postmortem." (Dkt. 377 at 17). Defendants note that Dr. Leestma admits he has never personally diagnosed SCIWORA in any of his brain or spinal cord autopsies. Merely because Dr. Leestma has never diagnosed someone with SCIWORA postmortem does not mean he is not qualified to do so. Dr. Leestma is familiar with the literature on SCIWORA and its diagnosis and addressed the phenomenon of SCIWORA in his textbook *Forensic Neuropathology*. (Dep at 9-10). Although there is no specific protocol, i.e. a "formalized checklist," for diagnosing SCIWORA that Dr. Leestma is aware of, he testifies that the diagnosis is "fairly self-evident" to someone with his background in forensic pathology and neuroscience who is familiar with the pathology literature. (Dkt. 377-2 at *9:16–24*). In their reply brief, Defendants argue that the City's retained neurosurgeon, Dr. Moore, explained that SCIOWAR was initially defined by Pang and Wilberger in the early 1970 as a

syndrome "to be applied in clinical treatment of living patients . . ." (Dkt. 377 at 17) (*citing* Dkt. 377-7 at 3). Dr. Moore stated, "I have never seen any research or studies that discuss diagnosing SCIWORA postmortem at either the autopsy or neuropathology stage." (Dkt. 377-7 at 3–4). This dispute among the experts is a matter to be addressed at trial. It is not a basis to exclude Dr. Leestma's testimony.

Fourth, Defendants argue that Dr. Leestma cannot give "any scientific basis to conclude that Godinez sustained a severe phrenic nerve injury that would cause diaphragmatic paralysis and a complete inability to breathe." (Dkt. 275 at 13–14). Defendants contend that for Dr Leestma's theory to work, both sides of the phrenic nerve would have to be compromised to cause paralysis on both sides of the diaphragm; yet Dr. Leestma cannot determine that both sides of the phrenic nerve were impaired based on the histology slide #11 alone. (Dkt. 275 at 20–21). Dr. Leestma admits he is "inferring and deducing" that the phrenic nerve was damaged based on what he observed, stating, "If you destroy or put a lesion at the place in the cord where I believe this is, everything below that and at that level is not going to work . . . goodbye phrenic nerve function." (Dkt. 339-3 at 93–95). Dr. Leestma's report explained that Godinez's neck and cervical spine suffered trauma and then was not immobilized when he was moved. (Dkt. 339-6 at 3). Based on the "edema and small hemorrhages in the spinal cord near the C2-C4 region," Dr. Leestma concluded that Godinez's "neck suffered further movement or trauma after the initial destabilization." *Id.* This "further movement or trauma" injured Godinez's spinal cord "causing phrenic nerve paralysis" and an inability of his diaphragm to function. *Id.*

As noted above, experts may extrapolate from the data as long as there is not "too great an analytic leap" between the data and the conclusion. *Gen. Elec. Co.*, 522 U.S. at 146. Dr. Leestma is well-within his area of expertise to opine about his observation of the C2-C4 spinal cord. He may also testify, based on his review of the video evidence and the Medical Examiner's report about the "palpable laxity" of Godinez's spine that he was prone to injury. It is a much closer question whether he may testify that Godinez suffered a second (unseen and yet necessary for his theory) injury during the transport or while in the van. (*See* Dkt. 339-6 at 3). However, considering all the evidence that Dr. Leestma considered, the Court finds that Dr. Leestma sufficiently explained his methodology for the purposes of a *Daubert* challenge. Defendants can address Dr. Leestma's methodology and his underlying assumptions through "vigorous cross-examination." *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."); *see also Williams v. Illinois*, 567 U.S. 50, 57, 132 S. Ct. 2221, 2228 (2012) ("Under settled evidence law, an expert may express an opinion that is based on facts that the expert assumes, but does not know, to be true. It is then up to the party who calls the expert to introduce other evidence establishing the facts assumed by the expert.").

Fifth, Defendants argue that Dr. Leestma improperly speculates how long a person would live after diaphragm paralysis. When asked how long it would take for a person to become unconscious after experiencing diaphragm paralysis, Dr. Leestma stated, "I don't know, [a] minute, two minutes, three minutes, I don't know everybody

is different." (Dkt. 339-3 at 95-97). Defendants argue this fails to account for the on-scene witness testimony that Mr. Godinez was moving very shortly before his death. But this goes to the weight of the testimony. When asked at deposition whether his cause of death opinion would change if he knew that there were non-police officer witnesses who said that there was movement in the police van, he stated, "Not necessarily. Again, it's – that's not objective, and it may be correct or it may not be correct, and I have no way to know." (Dkt. 339-3 at 121). Dr. Leestma explained his reason for not changing his conclusions based on the witness testimony. This challenge also goes to the credibility and accuracy of Dr. Leestma's opinion, not admissibility. *Grove US LLC v. Sany Am. Inc.*, No. 13-C-677, 2019 WL 969814, at *6 (E.D. Wis. Feb. 28, 2019) ("The Advisory Committee stressed that 'the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system' or to allow the district court to preempt the jury by evaluating the correctness of the facts on which the expert relied.").

Finally, Defendants argue that Dr. Leestma's failure to rule out excited delirium disqualifies him to opine on Mr. Godinez's cause of death. Dr. Leestma wrote a section of his book Forensic Pathology on excited delirium and stated that he believes it is a real syndrome. (Dkt. 339-3 at 128). While he has written about excited delirium syndrome and admitted that drugs like cocaine can cause someone to be in a delirious state, (*id.* at 131), he stated that determining whether Mr. Godinez took a lethal amount of cocaine was "outside [his] experience." (*Id.* at 138). When asked whether excited delirium or spinal cord injury caused Mr. Godinez's death, Dr. Leestma

testified: "Well I find evidence of a spinal cord injury, so for - I -I think I have to regard that as the best evidence . . .". (*Id.* at 135-136). The Court finds that this issue goes to the weight of the testimony, not the admissibility, and can be addressed on cross-examination. *Gayton*, 593 F.3d at 618–19; *Walker*, 208 F.3d at 589–90; *Cooper,* 211 F.3d at 1021.

## **CONCLUSION**

For the reasons discussed, the City's motion to bar the testimony of Plaintiff's retained expert, Dr. Jan Leestma [Dkt. 275] is **DENIED**.

E N T E R:

Dated: October 18, 2019

*Mary M Rowland*

MARY M. ROWLAND
United States District Judge